Exhibit 1

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

_____

CASE NO. 2022010354
CASE NO. 2022020274

_____

IN THE CONSOLIDATED MATTERS INVOLVING:

PARENT ON BEHALF OF STUDENT, AND

LAMMERSVILLE UNIFIED SCHOOL DISTRICT.

_____

# DECISION

MAY 6, 2022

On January 14, 2022, the Office of Administrative Hearings, called OAH, received a due process hearing request from Parent on behalf of Student, naming Lammersville Unified School District. On February 7, 2022, OAH received a due process complaint from Lammersville Unified, naming Parent on behalf of Student. OAH consolidated the matter on February 11, 2022. Administrative Law Judge Brian H. Krikorian heard this matter via videoconference on March 8, 9, 10, 15, 16, 17, and 22, 2022.

Nicole Hodge-Amey, Attorney at Law, represented Student. Parents attended all hearing days on Student's behalf. David Mishook represented Lammersville Unified. Dr. John Saylor, Special Education Director, attended all hearing days on Lammersville Unified's behalf.

At the parties' request, the matter was continued to April 21, 2022, for written closing briefs.  The record was closed, and the matter was submitted on April 21, 2022.

An individualized educational program is referred to as an IEP.  A free appropriate public education is referred to as a FAPE.  The Administrative Law Judge is referred to as ALJ.

# ISSUES

## STUDENT'S ISSUES

1. Did Lammersville Unified deny Student a FAPE during the 2021-2022 school year, through January 14, 2022, by failing to provide Student's educational records to Parents and Student's attorney within statutory timelines?

2. Did Lammersville Unified deny Student a FAPE during the 2018-2019, 2019-2020, 2020-2021, and 2021-2022 school years, through January 14, 2022, by failing to:

    a. adhere to child find obligations;

    b. timely and appropriately assess Student in all areas of suspected disability;

    c. conduct a health assessment;

    d. conduct an assistive technology assessment; and

    e. conduct any appropriate evaluations?

3. Did Lammersville Unified deny Student a FAPE during the 2019-2020, 2020-2021, and 2021-2022 school years, through January 14, 2022, by failing to offer Student appropriate and measurable annual goals in the areas of reading, spelling, writing, math, and speech?

4. Did Lammersville Unified deny Student a FAPE during the 2019-2020, 2020-2021, and 2021-2022 school years, through January 14, 2022, by failing to provide Parents with a clear written offer of FAPE, in IEPs dated November 6, 2019, October 20, 2020, December 9, 2020, and October 20, 2021?

5. Did Lammersville Unified deny Student a FAPE during the 2019-2020, 2020-2021, and 2021-2022 school years, through January 14, 2022, by failing to deliver and implement services, and specifically by failing to implement Student's:

   a. November 6, 2019 IEP as written, beginning in March 2020, due to school closures related to the COVID-19 pandemic;

   b. October 20, 2020 IEP in the area of speech; and

   c. October 20, 2021 IEP in its entirety?

6. Did Lammersville Unified deny Student a FAPE during the 2019-2020, 2020-2021, and 2021-2022 school years, through January 14, 2022, and specifically, at IEP team meetings dated November 19, 2019, October 20, 2020, December 9, 2020, May 11, 2021, September 8, 2021, and October 20, 2021, when it predetermined Student's special education eligibility, supports, related services, and placement?

7. Did Lammersville Unified deny Student a FAPE during the 2019-2020, 2020-2021, and 2021-2022 school years, through January 14, 2022, and specifically, at IEP team meetings dated November 19, 2019, October 20, 2020, December 9, 2020, May 11, 2021, September 8, 2021, and October 20, 2021, by failing to make an offer of supports, services, instruction, and placement to enable Student to make progress in light of Student's circumstances?

## LAMMERSVILLE UNIFIED'S ISSUE

1. Did Lammersville Unified's October 20, 2021 IEP offer Student a FAPE in the least restrictive environment?

# JURISDICTION

The ALJ held the hearing under the Individuals with Disabilities Education Act, its regulations, and California statutes and regulations. (20 U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 (2006) et seq.; Ed. Code, § 56000 et seq.; Cal. Code Regs., tit. 5, § 3000 et seq.) The main purposes of the Individuals with Disabilities Education Act, referred to as the IDEA, are to ensure:

- all children with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living, and
- the rights of children with disabilities and their parents are protected. (20 U.S.C. § 1400(d)(1); See Ed. Code, § 56000, subd. (a).)

The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter relating to the identification, assessment, or educational placement of the child or the provision of a FAPE to the child. (20 U.S.C. § 1415(b)(6) & (f); 34 C.F.R. § 300.511; Ed. Code, §§ 56501, 56502, and 56505; Cal. Code Regs., tit. 5, § 3082.) The party requesting the hearing is limited to the issues alleged in the complaint unless the other party consents and has the burden of proof by a preponderance of the evidence. (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i); *Schaffer v. Weast* (2005) 546 U.S. 49, 57-58, 62 [126 S.Ct. 528, 163 L.Ed.2d 387]; and see 20 U.S.C. § 1415(i)(2)(C)(iii).) In this consolidated hearing, each party has the burden of proving the issues raised by the complaints they filed. (20 U.S.C. § 1415(h)(4); Ed. Code, § 56505, subd. (e)(5).) The factual statements included in this decision constitute the findings of fact required by the IDEA and state law. (20 U.S.C. § 1415(h)(4); Ed. Code, § 56505, subd. (e)(5).)

Student was nine years, one-month-old and in third grade at the time of the hearing.  Student resided within Lammersville Unified's geographic boundaries at all relevant times and was attending Bethany Elementary School.  Student was eligible for special education under the categories of Specific Learning Disability and Speech or Language Impairment.

## STATUTE OF LIMITATIONS

In Student's Issues 2, 3, 4, 6, and 7, Student asserted claims based upon facts that occurred more than two years before the filing of Student's complaint.  Lammersville Unified contended that any advanced claims before January 14, 2020, two years before filing, were barred by the statute of limitations.  Student did not prove entitlement to any tolling of or exceptions to the statute of limitations.

The statute of limitations for special education due process claims in California is two years, consistent with federal law.  (Ed. Code, § 56505, subd. (l); see also 20 U.S.C. § 1415(f)(3)(C).)  The statute of limitations operates to bar claims based upon facts outside of the two-year period.  (*J.W. v. Fresno, supra*, 626 F.3d 431, 444-445; *Breanne C. v. Southern York County School Dist.* (M.D. Pa. 2009) 665 F.Supp.2d 504, 511-512; *E.J. v. San Carlos Elementary School Dist.* (N.D.Cal. 2011) 803 F.Supp.2d 1024, 1026, fn. 1.)  Title 20 United States Code section 1415(f)(3)(D) and Education Code section 56505, subdivision (l), establish two exceptions to the statute of limitations in cases in which the parent was prevented from filing a request for due process due to specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint, or by the local educational agency's withholding of information that was required to be provided to the parent.

A claim accrues for purposes of the statute of limitations when a parent learns of the injury that is a basis for the action, i.e. when the parent knows that the education provided is inadequate. (*M.D. v. Southington Board of Ed.* (2d Cir. 2003) 334 F.3d 217, 221: *M.M. & E.M. v. Lafayette School Dist.* (N.D.Cal., Feb. 7, 2012 Nos. CV 09–4624, 10-04223 SI) 2012 WL 398773, ** 17 - 19.) In other words, the statute of limitations begins to run when a party is aware of the facts that would support a legal claim, not when a party learns that it has a legal claim. (See *El Pollo Loco, Inc. v. Hashim* (9th Cir. 2003) 316 F.3d 1016, 1039; see also *M.M. V. Lafayette School District* (9th Cir. 2014) 767 F.3d 842, 858-59.)

Here, Student offered no credible or persuasive testimony that Parents were not informed nor aware of facts regarding Student's performance and assessments, which formed the basis of Student's claims before January 14, 2020. On the contrary, the evidence established that Parents were intricately involved in the process, were provided documents from Lammersville Unified when requested, and participated in Student's IEP's and educational programing. Parents knew of facts upon which any claims would be predicated before January 14, 2020.

Student argued that Lammersville Unified misrepresented facts surrounding Student's disability to Parents by intentionally reporting to Parents that Student's functioning was typical and acceptable for each grade level. These were not misrepresentations but opinions. For example, Student's kindergarten teacher reported that Student was progressing well with the class and was meeting kindergarten expectations. Student's first-grade teacher indicated that Student was struggling in reading but was progressing. She attributed Student's struggles to a lack of confidence. Finally, the psychoeducational assessment concluded Student had severe discrepancies in comprehension but believed Student didn't qualify for a specific learning disability.

Lammersville Unified's personnel consistently testified that these assessments were based upon observations of Student's current grade level and skills and advised Parents of their observations.  Student failed to demonstrate that Parents were unaware of the facts that supported the legal claims in Student's issues more than two years before the complaint's filing.  Student also failed to prove, by a preponderance of the evidence, that either of the statutory exceptions applies.  Accordingly, all of Student's claims that were based upon facts before January 14, 2020, are barred by the statute of limitations.

## STUDENT'S ISSUE 1: DID LAMMERSVILLE UNIFIED DENY STUDENT A FAPE DURING THE 2021-2022 SCHOOL YEAR, THROUGH JANUARY 14, 2022, BY FAILING TO PROVIDE STUDENT'S EDUCATIONAL RECORDS TO PARENTS AND STUDENT'S ATTORNEY WITHIN STATUTORY TIMELINES?

Parents made multiple email requests for records to Lammersville Unified during 2021.  On December 3, 2021, counsel for Student made a formal record request to Dr. John Saylor, the Director of Special Education.  Student argued that Lammersville Unified failed to provide complete records to Student as required by law, which constituted a denial of FAPE.  Lammersville Unified disputed this contention and argued it had provided all of the Student's records required under the law.  Lammersville Unified did not deny Student a FAPE by failing to provide records to Student or Student's attorney.

A Student or Parent may request educational records under California law and the IDEA.  (Ed. Code §56504, 20 U.S.C. §1415(b)(1).)  The IDEA provides that the school district must provide an opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, the provision of a

FAPE to such child, and to obtain an independent educational evaluation of the child. (20 U.S.C. §1415(b)(1).)

States must establish and maintain certain procedural safeguards to ensure that each student with a disability receives the FAPE to which the student is entitled and that parents are involved in the formulation of the student's educational program. (*Target Range* (9th Cir. 1992) 960 F.2d at 1483.) To fulfill the goal of parental participation in the IEP process, the school district is required to conduct a meaningful IEP meeting. (*Target Range*, supra, 960 F.2d at p. 1485.) A parent has meaningfully participated in the development of an IEP when he or she is informed of the child's problems, attends the IEP meeting, expresses disagreement regarding the IEP team's conclusions, and requests revisions in the IEP. (*N.L. v. Knox County Schools* (6th Cir. 2003) 315 F.3d 688, 693; *Fuhrmann v. East Hanover Board of Education* (3d Cir. 1993) 993 F.2d 1031, 1036 [parent who has an opportunity to discuss a proposed IEP and whose concerns are considered by the IEP team has participated in the IEP process in a meaningful way].)

Over the course of 2021, Parents or their advocate made record requests from Student's school and Lammersville Unified. The evidence showed that Lammersville Unified's district members timely responded and provided the available documents. On December 3, 2021, Marie Fajardo, a paralegal for Student's law firm, submitted a record request for all of Student's records to Lammersville Unified. The request listed 13 different categories of documents, including all evaluations, prior written notices, health records, cumulative records, test results, and any other records related to Student's education.

On December 10, 2021, Dr. Saylor sent Fajardo an email containing an electronic student records file. Dr. Saylor also advised Fajardo that Lammersville Unified had audio

files too large to be emailed. After consulting with Fajardo, Dr. Saylor uploaded the audio files to Student's counsel on December 15, 2021.

Fajardo testified that the December 10 and December 15, 2021 productions did not include several documents. These included a December 9, 2020 IEP amendment, tests of cognitive scores, San Diego Quick assessment results, a Developmental Reading Assessment, the 2021 Academic Progress report, a placement test, a occupational therapy report, 2020-2021 MAP scores, and a September 27, 2021 email. Fajardo testified that raw data from the assessments, as well as protocols used by the assessors, were also not produced. Other than testimony, however, Student did not submit as evidence the Student records that Dr. Saylor sent to Fajardo or any documents that were explicitly not provided to Parents or their advocate. Therefore, Student did not establish what records Lammersville Unified did not produce. Also, Lammersville Unified's policy was to shred raw data and protocols after an assessment's completion, and Student cited no authority that this was improper.

Student failed to establish a discrepancy between what Student requested and the documents that Lammersville Unified produced. Fajardo acknowledged that many of the alleged missing documents were already in possession of Parents and their advocate, Cari Edwards. While Lammersville Unified must keep records, Student also must establish how the missing records impacted the Student in a harmful matter. Student did not identify what Student records were not available to Student, Parents, and Student's counsel.

Here, Student did not establish that Lammersville Unified violated Student's or Parent's procedural rights by failing to provide records upon request, which denied Student a FAPE. Some documents may not have been included in the December 10 and 15, 2021 productions. Still, Student failed to identify which documents were missing and

did not establish which records, if any, were not already in possession of Parents, their advocate, or attorney.  Student failed to demonstrate by a preponderance of the evidence that Parents were hampered in participating in the development of Student's IEP's and educational programing or that Student was deprived of educational benefits because of a failure to produce by Lammersville Unified.  Student did not prove by a preponderance of the evidence that Lammersville Unified caused a denial of FAPE by not timely producing Student's records.  Lammersville Unified prevailed on Student's Issue 1.

## STUDENT'S ISSUE 2: DID LAMMERSVILLE UNIFIED DENY STUDENT A FAPE DURING THE 2018-2019, 2019-2020, 2020-2021, AND 2021-2022 SCHOOL YEARS, THROUGH JANUARY 14, 2022, BY FAILING TO ADHERE TO CHILD FIND OBLIGATIONS, FAILING TO TIMELY AND APPROPRIATE ASSESS STUDENT IN ALL AREAS OF SUSPECTED DISABILITY, FAILING TO CONDUCT A HEALTH ASSESSMENT, FAILING TO CONDUCT AN ASSISTIVE TECHNOLOGY ASSESSMENT, AND CONDUCT ANY APPROPRIATE EVALUATION?

### LAMMERSVILLE UNIFIED DID NOT VIOLATE THEIR CHILD FIND OBLIGATIONS

Student contended that Lammersville Unified had enough knowledge to suspect that Student was a child with a disability.  Therefore, Lammersville Unified failed in its "child find" obligations by not assessing Student for special education eligibility.  Lammersville Unified asserted that it met its obligations.

As discussed above, Student's claims before January 14, 2020 are barred by the statute of limitations. Student did not prevail on this issue for any period before January 14, 2020. The remainder of the analysis of this issue will relate to claims for a denial of FAPE beginning January 14, 2020, through January 14, 2022.

Under the IDEA and California law, a school district has an affirmative, continuing obligation to identify, locate, and evaluate all children with disabilities residing within its boundaries. (20 U.S.C. § 1412(a)(3); Ed. Code, § 56300 et seq.) The duty is not dependent on any action or inaction by parents; the district must "actively and systematically seek out all individuals with exceptional needs...who reside in the district." (Ed. Code, § 56300.) In addition, the district must develop and implement "a practical method" to locate those individuals. (Ed. Code, § 56301.) Before any action is taken with respect to the initial placement of an individual with exceptional needs in special education instruction, an individual assessment of the pupil's educational needs shall be conducted, by qualified persons in accordance with testing requirements set forth in Education Code section 56320 subds. (a) through (i). (Ed. Code §§ 56320 & 56322.) This duty is commonly referred to as "child find."

Student was a kindergarten student at Bethany Elementary School during the 2018-2019 school year. Her teacher was Michaela Rosetto-Small, who testified at the hearing. She recalled Student suffered from separation anxiety, which was typical for many kindergarten students. By the end of the school year, Student had mastered letter sounds and letter recognition. She performed at grade level and worked on her consonant-vowel-consonant words, called CVC words. By the end of the year, Student approached the kindergarten standard and some CVC words.

Mother testified that during kindergarten, she had concerns with Student's reading abilities. Student would mix up CVC words such as saying "Tam" instead of

"Mat" or "Tac" instead of "Cat."  Student had difficulty picking up changes in the words and forgot her sight words.  She reversed letters.  Mother said she spoke with Rosetto-Small at the beginning of the 2018-2019 school year and mentioned she had dyslexia.  Mother worried that Student was having the same issues.  Rosetto-Small did not recall Mother discussing dyslexia.  But at the time, she assured Mother that Student was meeting her milestones and would show progression over the year.

Student was in first grade in the 2019-2020 school year.  Her teacher was Alice Gregorich.  Gregorich testified at the hearing.  At the start of first grade, Student was approaching or met grade level in most categories except reading foundational skills.  By the second trimester, Student made progress overall.  However, Gregorich noted that Student exhibited some behaviors which affected her learning opportunities.  This included some moodiness in the morning and a lack of self-confidence with classroom assignments and expectations.  However, once Student settled down, she became more capable with her abilities.  Gregorich observed that Student's read inconsistently at some points, and Student looked to Gregorich for reassurance.

Gregorich informed Mother that Student lacked confidence in her reading and struggled a little.  Student continued to struggle at home with sight words.  During the first half of the school year, Student attended a twice-weekly reading program for 30 minutes.  The classroom was divided in half, with one half working independently using a program called "I-read."  Mother observed Student having immense frustrations with the program because it was timed.  Mother requested that the timed portions be removed from Student's lessons.  Mother also raised concerns about Student's speech.  Gregorich told Mother that she felt that Student's reading and speech would improve with more practice.  However, Gregorich recommended to Mother that, if she was

concerned with Student's speech, Mother could write a letter requesting an assessment, which would be put in Student's file and trigger an evaluation.

Mother sent a letter to Lammersville Unified, which the district received on September 6, 2019.  Mother stated her concerns about Student's speech ability, and requested that Student's speech be evaluated.  Mother noted Student struggled with R, TH, and L sounds.  On September 18, 2019, Mother signed an assessment plan for Lammersville Unified to assess Student in health and speech and language.  Speech pathologist Michell Steneck assessed Student' speech, produced a November 4, 2019 report, and concluded that Student was eligible for special education services.

Lammersville Unified convened an IEP meeting on November 6, 2019 to review the speech assessment.  The IEP team found Student eligible for special education services under the primary category of speech and language impairment.  Student read at a first-grade level, but struggled with fluency and decoding.  Gregorich believed Student's confidence levels impacted her struggles.  The team noted that Student needed to wear glasses.  Lammersville Unified offered pull-out speech services for 30 minutes, eight times a month, for 240 minutes. Parents consented to the IEP. Beginning in March of 2020, and continuing sporadically in 2020 and 2021, schools were shut down due to the Covid-19 pandemic, and all instruction was virtual.

Here, Student did not prove by a preponderance of the evidence that Lammersville Unified failed to exercise its "child find" obligations.  Student was eligible for special education and entitled to a FAPE on the first day of the statutory period, January 14, 2020.

The crux of Student's "child find" allegations was that Lammersville Unified failed to identify student as having dyslexia, a specific learning disability.  However, the

district's "child find" obligations are not measured by whether they identified every category for eligibility but whether the district failed to identify Student as one with special needs. The "basic floor of opportunity" provided by the IDEA consists of access to specialized instruction and related services which are individually designed to provide educational benefits to the disabled Student. (*Board of Education of the Hendrick Hudson Central School Dist. v. Rowley* (1982) 458 U.S. 176, 201-204.)

Parents made a written request in early September 2019 for a speech and language evaluation. Lammersville Unified complied and assessed Student in speech and language. The IEP team found Student eligible for special education services under a speech and language impairment. Lammersville Unified fulfilled its "child find" obligations at that point. Student did not claim in this issue that Student's IEP in the Fall of 2019 did not address all areas of disabilities. Though additional disabilities may have manifested in the future, Lammersville Unified timely located and identified Student as a student who may need special education placement and services, assessed Student, and found Student eligible. Lammersville Unified met its "child find" duties. Lammersville prevailed on this part of the issue.

## LAMMERSVILLE UNIFIED APPROPRIATELY ASSESSED STUDENTS IN ALL AREAS OF DISABILITY, INCLUDING SPEECH AND LANGUAGE, ACADEMIC, PSYCHOEDUCATION, AND OCCUPATIONAL THERAPY

Student contended that Lammersville Unified failed to timely and appropriately assess Student in all areas of suspected disability. Student did not meet her burden of proof by a preponderance of the evidence.

A FAPE means special education and related services that are available to an eligible child that meets state educational standards at no charge to the parent or

guardian. (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.) Parents and school personnel develop an IEP for an eligible student based upon state law and the IDEA. (20 U.S.C. §§ 1401(14), 1414(d)(1); and see Ed. Code, §§ 56031,56032, 56341, 56345, subd. (a) and 56363 subd. (a); 34 C.F.R. §§ 300.320, 300.321, and 300.501.)

In general, a child eligible for special education must be provided access to specialized instruction and related services which are individually designed to provide educational benefit through an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. (*Rowley*, supra, 458 U.S. 176, 201-204; *Endrew F. v. Douglas County School Dist. RE-1* (2017) 580 U.S. ___ [137 S.Ct. 988, 1000].)

Federal law uses the term evaluation and California uses assessment, but the two terms have the same meaning and are used interchangeably in this Decision. Assessments are required to determine eligibility for special education, and the type, frequency, and duration of needed specialized instruction and related services. (20 U.S.C. § 1414(a); 34 C.F.R. § 300.303; Ed. Code, §§ 56043(k), 56381, subd. (a).). Each public agency must ensure that assessments and other evaluation materials used to assess a child are, among other things, administered by trained and knowledgeable personnel and administered in accordance with any instructions provided by the producer of such assessments. (20 U.S.C. § 1414(b) & (c); Ed. Code, §§ 56320, 56381, subd. (e); 34 C.F.R.§ 300.304.) The personnel who assess the student shall prepare a written report. (Ed. Code, § 56327.) A school district's failure to conduct appropriate assessments may constitute a procedural denial of a FAPE. (*Park v. Anaheim Union High School Dist.* (9th Cir. 2007) 464 F.3d 1025, 1031-1033.)

A proposed assessment plan shall be developed within 15 calendar days of referral for assessment, not counting calendar days between the pupil's regular school

sessions or terms or calendar days of school vacation more than five school days, from the date of receipt of the referral, unless the parent or guardian agrees in writing to an extension, pursuant to Education Code section 56321, subdivision (a) (Ed. Code § 56043, subd. (a)).  Once a child has been referred for an initial assessment to determine whether the child is an individual with exceptional, an IEP team meeting shall occur within 60 days of receiving parental consent for the assessment. (Ed. Code §56043(c)). An IEP required as a result of an assessment of a pupil shall be developed within a total time not to exceed 60 calendar days, not counting days between the pupil's regular school sessions, terms, or days of school vacation in excess of five schooldays, from the date of receipt of the parent's or guardian's written consent for assessment, unless the parent or guardian agrees in writing to an extension, pursuant to Section 56344. (Ed. Code §56043(f)(1)).  Each local educational agency shall ensure that a child is assessed in all areas of suspected disability.  (20 USC §1414(b)(3)(B)).

On January 14, 2020, Student received speech and language special education services from a speech and language therapist for 240 minutes per month.  Student also continued to receive assistance in reading in the general education classroom.  There was no evidence that Student had manifested difficulty in writing, health, or occupational therapy by that date.  Although Parents and Gregorich both noted Student struggled with reading, neither Parent nor Gregorich suggested that Lammersville Unified assess Student for reading at any time before October 21, 2020.  Student's report cards for the first two semesters of first grade showed that Student was either at grade level or approaching grade level in reading.  The final semester encompassed the Covid-19 shutdown of schools.

## TIMELINESS

The IEP team held an annual meeting on October 21, 2020. During the meeting, Parents raised concerns about Student's speech and current academic performance. Student's second-grade teacher Susan Cabri indicated that Student was struggling in reading and was still reading at a kindergarten level. Cabri reported that Student may have "additional concerns regarding her learning." At this point, the IEP team discussed providing additional assessments "to rule in or out learning disability." Parents agreed, signed the IEP, and approved the assessments. After that, Lammersville Unified conducted academic and psychoeducational assessments, which the IEP team reviewed at a December 9, 2020 meeting, per the statutory 60-day timetable.

On May 10, 2021, Lammersville Unified received a written request from Parents for assessments in assistive technology and a more comprehensive speech and language assessment. On May 14, 2021, Dr. Saylor agreed to conduct the two assessments. Parents signed an assessment plan, consenting to assessments in those two areas on May 17, 2021. Because of the intervening summer break, Lammersville Unified conducted both assessments at the beginning of the 2021-2022 school year, which met the 60-day requirement. The IEP team discussed the assessments at the September 8, 2021 IEP meeting.

On October 1, 2021, Lammersville Unified prepared an assessment plan for an occupational therapy evaluation, which Parents signed and returned on October 14, 2021. Student was assessed on October 27, 2021. The IEP team reviewed the assessment at the second session of the annual IEP review on November 17, 2021, which met the 60-day time limitation.

Lammersville Unified complied with its obligations to conduct each assessment within the statutory timelines. Student did not prove by a preponderance of the evidence that Summerville Unified violated Student's procedural rights by delaying any assessment or the review of the assessments by the IEP team.

## THE 2021 SPEECH AND LANGUAGE ASSESSMENT

Pathologist Steneck's September 19, 2019 speech and language assessment predates the cut off of the January 14, 2020 statute of limitations. Student's challenges to the September 2019 assessment are barred by the statute of limitations.

Marci McCourtie was employed by Lammersville Unified and has been a coordinator of special education since July of 2021. McCourtie had a master's degree and was a credentialed speech and language pathologist. McCourtie conducted a speech and language evaluation of Student on August 25, 26, 30 and 31, 2021, and prepared a report dated September 6, 2021. McCourtie testified at hearing.

At the time of the evaluation, Student was commencing third grade and was eight years of age. According to Parents, Student was still struggling with annunciating "r", "s" and "t" sounds. Parents voiced concern that Student became frustrated with her lack of expression and often left out critical portions of words in her sentences and reading. McCourtie noted that at the time of the 2019 evaluation, Student's fluency and voice were within the normal limits, and her receptive and expressive language skills were within the average range. Student had been receiving three 30-minute speech therapy sessions per week since the evaluation.

McCourtie administered six standardized assessments, including the Goldman-Fristoe Test of Articulation-3, the Receptive One-Word Picture Vocabulary Test, 4th Edition, Expressive One-Word Picture Vocabulary Test, 4th edition, Clinical

Evaluation of Language Fundamentals-5, Comprehensive Assessment of Spoken Language, 2nd Edition, and the Language Processing Test-3 Elementary. McCourtie observed Student over four testing sessions of approximately five hours. Testing was spread out over several sessions to give Student a break. Student was cooperative, friendly, and engaged. McCourtie also observed Student in her classroom on September 2, 2021. Students were occupied in a writing project after a reading passage on fire safety. Student appeared engaged and followed her teacher's instructions. Student needed some assistance with the writing assignment. Student was provided additional time to complete her work.

McCourtie judged Student's voice and fluency to be within the normal limits. Student had some difficulty producing words that contained "er" and vocalic /r/ words like "hammer" or "guitar." McCourtie opined that to a trained listener, Student's speech was intelligible, although she noted that the third-grade teacher reported Student's speech could sometimes be difficult to understand. Nonetheless, in McCourtie's opinion, Student had made significant progress and growth in articulation.

Student's receptive and expressive vocabulary were noted to be within the average and high-average range. Student scored perfectly on sentence comprehension. Student scored in the average range for word structure, although she misplaced some words and had difficulty with semantics and syntax. Student showed significant strength in formulating a sentence, but had trouble with attention as sentences became longer. However, Student's recall was in the average range, as was her score in pragmatic language. McCourtie opined that Student had strong receptive, expressive, and pragmatic skills overall. Student still struggled with articulation. McCourtie recommended continued special education speech and language services in articulation.

McCourtie presented a legally compliant, comprehensive assessment report. She outlined Student's needed accommodations and related services and the basis for each determination. McCourtie noted the appropriate behavior, in detail, during her observation of the Student in a proper setting and the relationship of that behavior to the student's academic and social functioning. The assessment report contained the educationally relevant observations, development, and findings, along with the record of implementing normed evaluation tests. Student did not present any evidence from any witness or expert to support her contention that the September 6, 2021 speech and language assessment was inadequate or incorrect in any way. Student did not present any qualified witness or expert to contradict McCourtie's testimony that that the evaluation was properly completed. Accordingly, Lammersville Unified appropriately assessed Student for speech and language in September of 2021.

## THE 2020 ACADEMIC ASSESSMENT

Liliana Garcia was a resource specialist employed by Lammersville Unified. She held a credential as an education specialist in multiple subjects and to teach special education. She was a resource teacher for grades kindergarten to fourth, providing additional academic resource instruction for students. Garcia testified at the hearing.

Garcia assessed Student in academics on November 18, 19 and 20, 2020. She prepared a written report dated December 9, 2020. She observed Student in her classroom during the morning routine. Garcia observed Student working at a similar pace as her peers. Student needed clarifying instruction on the subject of "writing numbers in order." However, once the problem was read to her, Student understood what to do and completed it with ease.

Garcia administered the Woodcock-Johnson IV Tests of Achievement and Woodcock-Johnson IV Tests of Oral Language and The Gray Oral Reading Test-Fifth Edition. During assessment sessions, Student was shy at first but then became talkative and more comfortable. Student was slow and careful when she responded but persisted in completing difficult tasks. In reading, Student scored in the very low to average range. She identified initial items rapidly and accurately but had difficulty applying phoneme-grapheme relationships to latter items. When asked to read orally, Student did well with the first sentences. However, as the sentences increased in difficulty, she mispronounced words. She scored in the low-average range. Student also scored low in word reading fluency, reading fluency, low in reading vocabulary, and low reading recall. Student struggled in reading as she appeared to read passages very slowly and had difficulty identifying the correct words.

Student scored in the low to average range in mathematics, although Garcia felt that this was an area of strength for Student. In writing, Student scored in the low to average range. Garcia opined that writing was another area of strength for Student. Based upon the Woodcock-Johnson tests, Garcia concluded that Student's areas of weakness were reading fluency, reading rate, and reading comprehension. On the Gray Oral Reading Test, Student scored in the low-average range in accuracy and fluency and scored in the low range in rate and comprehension. Garcia recommended specific accommodations for Student to enhance her reading skills.

Garcia timely provided a six-page written report to Parents and the IEP team on December 9, 2020. Garcia presented a legally compliant, comprehensive assessment report. The report set forth that Student needed accommodations and related services and provided Garcia's reason for making each determination. The report detailed Student's appropriate behavior during Garcia's observation of Student, in a proper

setting, and the relationship of that behavior to Student's academic and social functioning. The assessment report contained the educationally relevant observations, development, findings, and the record of implementing normed evaluation tests. Student did not present any qualified witness or expert to contradict Garcia's testimony that the evaluation was properly completed. Accordingly, Lammersville Unified appropriately assessed Student for academics in December of 2020.

## THE 2020 PSYCHOEDUCATIONAL ASSESSMENT

Attif Raza had been employed for eight years as a school psychologist for Lammersville Unified, and previously was both a school counselor and a teacher. Raza assessed Student in psychoeducation on December 8, 2020, and prepared a written report dated December 3, 2020. Raza presented his report at an IEP meeting on December 9, 2020. Raza testified at the hearing.

Raza reviewed a questionnaire completed by Parents, and interviewed Parents on December 4, 2020. Mother reported that Student was struggling with reading and had a hard time decoding. Student struggled daily, although sometimes it was worse on some days than others. Raza also interviewed Student's second-grade teacher, Cabri. Cabri advised Raza that Student struggled with reading and language arts. Raza reported that Student did not have any known health issues, and that Mother had been diagnosed with dyslexia as a child. Student also struggled during distance learning. Raza observed Student in class on two occasions on December 8, 2020. Raza's report included copies of photos showing the type of work Student was doing during his observation. The photos included notes where Student lost focus, performed well, and where she struggled in reading.

In addition to his interviews, observations and file review, Raza utilized the standardized testing and procedures for his evaluation. These included the Behavior Assessment System for Children-3rd Edition, the Test of Auditory Processing Skills-4th Edition, the Berry-Buktenica Developmental Test of Visual-Motor Integration-6th Edition; the Woodcock-Johnson Test of Cognitive Abilities-4th Edition, and the Comprehensive Test of Phonological Processing-2nd Edition.

Student's social and emotional behavior was within the normal range. In cognitive ability, Student scored in the average range for comprehension and knowledge, short-term memory, short-term recall, visualization, and in the high-average range for fluid reasoning. Student scored in the low-average range for cognitive processing speed and auditory processing. Student's phonological processing, auditory memory, and listening comprehension were in the average range. Raza opined that Student did not appear to have any phonological processing deficits.

Raza also reviewed the academic scores of the Woodcock-Johnson tests and concluded that Student was scoring in the average range for cognitive ability. However, he found a "severe discrepancy" based upon Student's reading comprehension scores, which were very low. Raza noted that "dyslexia" was not an eligibility criterion, but that dyslexia fell within the eligibility of "specific learning disorder." Raza further opined that to qualify for a specific learning disability, Student must display both a cognitive processing deficit, and a severe discrepancy between her cognitive ability and academic achievement. Raza concluded that both factors were not present, and therefore concluded Student did not qualify under the category of specific learning disorder. Raza made recommendations for Student to improve in her areas of weakness.

Raza timely provided a 22-page written report to Parent and the IEP team on December 9, 2020. Raza presented a legally compliant, comprehensive assessment

report.  It set forth that Student needed accommodations and related services and the basis for making that determination.  In detail, Raza noted the appropriate behavior during his observation of the Student in a proper setting and the relationship of that behavior to the Student's academic and social functioning.  The assessment report contained the educationally relevant observations, development, findings, and the record of implementing normed evaluation tests.

In May of 2021, Lammersville agreed to Student's request for an independent psychoeducational evaluation.  The independent examiner, Ruth Rubalcava, concluded in September 2021 that Student had dyslexia, and that her primary eligibility should be specific learning disorder.  The IEP team subsequently agreed with the independent educational evaluation's recommendations.  While she reached a different conclusion, Dr. Rubalcava did not offer any opinion on the validity of Raza's assessment.  Student did not establish by a preponderance of the evidence that Raza's evaluation was inappropriate.  Accordingly, Lammersville Unified appropriately assessed Student for psychoeducation in December of 2020.

Finally, whether Lammersville Unified had sufficient information to assess Student before December 2020 was not proven by a preponderance of the evidence.  Parent requested a speech assessment at the commencement of first grade.  At the same time, Parent raised concerns about Student's reading comprehension.  The evidence showed that Gregorich believed Student's reading was at an appropriate level at the commencement of the first grade and testified that Student did improve and make progress during the year.  By the November 9, 2019 IEP meeting, the primary concern was Student's speech and articulation.  Gregorich believed the speech deficits impacted Student's confidence and therefore affected Student's reading fluency.  Student's report card for the first grade demonstrated that Student was meeting expectation levels, or at

expectation levels, in reading, comprehension, and writing. There was no evidence that Lammersville Unified was on notice during the Covd-19 shutdown that Student was struggling. Student did not submit any expert witness testimony that district personnel should have been aware of any reading disorder as early as January 2020. To the contrary, Dr. Rubalcava testified those signs manifested in the second grade. As such, Student did not establish that Lammersville Unified should have assessed Student in the area of psychoeducation sooner than December 2020.

## THE 2021 OCCUPATIONAL THERAPY EVALUATION

Ritu Bathwal is an occupational therapist employed by Lammersville Unified. At the request of Parents, Bathwal completed an occupational therapy evaluation of Student on October 27, 2021. Bathwal testified at the hearing.

Bathwal observed Student in class. She noted that Student wore glasses throughout the observation and during the assessment. The assessment was done in a separate environment, away from the classroom. Student exhibited a functional grasp for writing and using items such as scissors. She was able to cut a zig-zag and wavy lines with good quality. She exhibited good bilateral hand skills. The written report included a sample of Student's writing, which was legible. Student's overall score in visual motor and perception fell in the average range. Student showed no fine motor deficits. Bathwal concluded that Student had performed in the average range overall, and her fine motor foundational skills appeared intact. She opined that Student's writing was immature-looking, but legible. She did not recommend occupational therapy services, although she believed Student would benefit from writing practice.

Bathwal timely provided a four-page written report to Parent and the IEP team on November 17, 2021. Bathwal presented a legally compliant, comprehensive assessment

report.  Bathwal's report detailed her observation of the Student in a proper setting and the relationship of that behavior to the Student's fine motor skills.  The assessment report contained the educationally relevant observations, development, findings, and a record of implementing normed evaluation tests.  Student did not present any qualified witness or expert, or any other evidence, that indicated the evaluation was not properly completed and legally compliant.  Accordingly, Lammersville Unified appropriately assessed Student for occupational therapy in October of 2021.

## THE 2021 ASSISTIVE TECHNOLOGY ASSESSMENT

Ellen Hoke is a special education teacher at Lammersville Unified.  She prepared an assistive technology report dated September 8, 2021.  Hoke did not testify at hearing, although her report was admitted into evidence.

Hoke's report did not indicate any observations of Student.  It also did not include any interviews or discussions with Student's third grade teacher or Parents.  There was no indication that Hoke relied on any specific tests or findings for her report.  The report consists of seven pages, and primarily provided recommendations to assist Student to try to determine what would be best for Student.

Hoke's report to Parent and the IEP team met the timing requirements of the IDEA and California Education Code.  However, due to the lack of observations, data and testing, Hoke did not present a legally compliant, comprehensive assessment report.  Under the law, Lammersville Unified was required to file a petition with OAH to establish that its assistive technology report was legally appropriate or fund an independent examination.  In October of 2021, Lammersville Unified agreed to fund an independent educational assessment in assistive technology with the Center for Accessible Technology.  Student did not provide any evidence or testimony as to the independent

evaluation results, nor can Student seek a new remedy based upon the original assessment.

## OTHER ASSESSMENTS

Student alleges that Lammersville Unified failed to appropriately conduct assessments in "all areas" of suspected disability and health. First, Student did not meet her burden of proof by a preponderance of the evidence that Lammersville Unified was aware of any other specific areas of need for the Student other than the areas discussed above. No other witnesses or experts testified about Student's deficiencies in other areas. Lammersville Unified did not determine that Student's educational needs warranted other evaluations, and Parent never requested any other evaluations before filing the due process complaint.

Although the various assessors noted Student's health history in their reports, Lammersville Unified did not conduct an independent health assessment. Again, Student did not meet her burden of proof by a preponderance of the evidence that Lammersville Unified denied Student a FAPE or committed a procedural violation by not doing a separate health assessment. Student presented no evidence that the lack of a separate health assessment impacted the legal appropriateness of Lammersville Unified's assessments.

As such, Lammersville Unified did not fail to appropriately and timely conduct evaluations in any other areas or in health. Lammersville Unified prevailed on Student's Issue 2.

STUDENT'S ISSUE 3: DID LAMMERSVILLE UNIFIED DENY STUDENT A FAPE DURING THE 2019-2020, 2020-2021, AND 2021-2022 SCHOOL YEARS, THROUGH JANUARY 14, 2022, BY FAILING TO OFFER STUDENT APPROPRIATE AND MEASURABLE ANNUAL GOALS IN THE AREAS OF READING, SPELLING, WRITING, MATH, AND SPEECH?

Student argues that Lammersville Unified failed to offer appropriate and measurable goals in reading, spelling, writing, math, and speech for three school years. Lammersville contends the goals were appropriate and measurable.

The IEP must include appropriate objective criteria, evaluation procedures, and schedules for determining, on at least an annual basis, whether the annual goals are being achieved and a statement of how the student's progress toward the goals will be measured. (*Jessica E. v. Compton Unified School Dist.* (C.D. Cal. 2017, No. CV16-04356-BRO) 2017 WL 2864945; see also Ed. Code, § 56345; 20 U.S.C. § 1414(d)(1)A)(i).) An examination of the goals in an IEP is central to determining whether a student received a FAPE. "[W]e look to the [IEP] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer...a meaningful benefit." (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149.)

The IEP must include a statement of the program modifications or supports that will be provided to the student to allow the student to advance appropriately toward attaining the annual goals; to be involved in and make progress in the general education curriculum, and to participate in extracurricular activities and other nonacademic activities. (34 C.F.R. § 300.320(a)(4)(i)-(ii); Ed. Code, § 56345, subds. (a)(4)(A), and (B).)

The purpose of annual goals is to permit the IEP team to determine whether the pupil is making progress in an area of need.  (Ed. Code, § 56345, subd. (a).)  For each area in which a special education student has an identified need, the IEP team must develop measurable annual goals that are based upon the child's present levels of academic achievement and functional performance, and which the child has a reasonable chance of attaining within a year.  (Ed. Code, § 56345; *Letter to Butler* (OSERS 1988) 213 IDELR 118.)

In developing the IEP, the IEP team must consider the strengths of the child, the concerns of the parents for enhancing the child's education, the results of the most recent evaluation of the child, and the academic, developmental, and functional needs of the child.  (20 U.S.C. § 1414(d)(3)(A); 34 C.F.R. § 300.324 (a).).  Whether an IEP offers a student a FAPE is assessed in light of information available when the IEP was developed, not in hindsight.  (*Adams,* supra at 1149.)  An IEP "is a snapshot, not a retrospective;" it must be evaluated in terms of what was objectively reasonable when the IEP was developed.  (*Id.* quoting *Fuhrmann,* supra at 1036.)

## THE 2019-2020 IEP

The IEP team held a meeting on November 6, 2019 to review Steneck's 2019 speech and language assessment.  Student was in first grade.  Steneck, Debbie Wingo, the school principal, Gregorich, and Parents attended the IEP meeting.

Gregorich indicated that Student was struggling with language as well as confidence.  Student was able to recall receptive language and was verbal and expressive.  However, Student did struggle with foundational reading concepts such as decoding.  Parents concurred and expressed concern about Student's reading skills.  The team believed that Student needed to work on her confidence levels.

Steneck presented her assessment.  The IEP team agreed that Student qualified for special education services under speech and language impairment in the areas of articulation.  Student was offered speech services twice weekly to address articulation errors outside the classroom.

Two goals were presented.  The first goal was in speech intelligibility.  Student often articulated with "gliding" sounds, such as substituting /w/ for /r/ words.  By November 5, 2020, when given a visual prompt, Student would be able to correctly produce the /r/ and /w/ sounds and r-blends in all position of words with 80% accuracy over two sessions.  The goal provided three short-term objectives to measure progress. The goal provided an appropriate baseline on Student's current articulation deficits.

The second goal was on /s/ and /s/ blends.  Student distorted the /s/ in the final position of words and in blends, and /sw/ for /shw/ words.  By November 5, 2020, when given a visual prompt, Student would be able to accurately produce the /s/ and /s/ blend sounds with 80% accuracy over two sessions. The goal provided three short-term objectives to measure progress.  The goal provided an appropriate baseline on Student's current articulation deficits.

No other goals were included.  Parents consented and agreed to the IEP. Although Student experienced reading deficits at the time, the team did not conclude there was sufficient data to provide reading or math goals.  Student did not prove, by a preponderance of the evidence, that Student's goals in the 2019-2020 IEP were not measurable or were inappropriate.

THE OCTOBER 20, 2020 IEP

SPEECH GOALS

The IEP team held an annual meeting on October 21, 2020.  Student was in second grade.  Steneck, Wingo, Cabri, and Parent attended the meeting, which was held virtually via videoconference due to the Covid-19 pandemic.

Student was reading at the mid-kindergarten grade level and had mastered short vowel sounds.  She received test assistance with an aide or teacher reading questions on an as-needed basis.  Student was making good progress on her speech goals.  She continued to need prompting to keep her tongue back when producing /r/ sounds, and to remain focused and on task.

Student had not met her first goal of speech intelligibility.  At the time of the IEP meeting, she was identifying /l/ sounds with 80% efficiency, but was scoring in the 40-73 percent accuracy range for the other sounds.  Student met her second goal of /s/ and /s/ blends.  The team proposed a continuation of goal number one, in articulation for the /r/ words.  By October 20, 2021, with no prompts, Student would improve speech intelligibility by independently producing the /er, ir, or ar/ in single words in four-out-of-five trials at 80% accuracy.  Student continued to receive speech services. There were no other goals proposed.

Student did not prove, by a preponderance of the evidence, that Student's speech goals in the October 20, 2020 IEP were not measurable or were inappropriate. Student had met one of her previous goals, and the new goal continued with addressing Student's deficiency with /r/ type words.  Student also did not prove that Student required a math goal in the October 20, 2020 IEP.

## READING GOALS

At the October 21, 2020 meeting, Parents raised continued concerns about Student's speech and academics.  Cabri, the second-grade teacher, indicated that Student struggled with reading and believed Student was reading at a beginning kindergarten level.  Cabri testified at the hearing that Student's struggles were likely made worse due to virtual learning, as school was still not in person.  Steneck noted at the meeting that Student was making improvements in her speech but continued to struggle with the /r/ words.  Because of Student's continued reading difficulties, the team proposed that additional assessments be conducted to "rule in or out learning disability or if she needs additional assessments."  Parents agreed with the IEP, although they later requested that Lammersville Unified include a two-page document noting exceptions in May of 2021.

## DECEMBER 9, 2020 AND MAY 11, 2021 IEP MEETINGS

Following the academic and psychoeducational assessments, the IEP team met on December 9, 2020 for a review.  Consistent with their reports, Garcia and Raza indicated that Student was scoring in the low ranges in reading comprehension and decoding but was also scoring in the average range for comprehension.  Raza concluded that because his tests did not indicate a processing disorder, Student did not have a specific learning disability. The IEP team agreed to meet in April or May to evaluate Student's progress.  The team did not add any goals to the October 20, 2021 IEP.

A follow-up IEP meeting was held on May 11, 2021.  McCourtie, Steneck, Garcia, Cabri, Wingo, Raza, Parents, and advocate Edwards were present.  The meeting was held virtually.  At this meeting Parents and their advocate strenuously contended that

Student's academic issues were not being addressed by district personnel. Parents requested a speech and language assessment and assistive technology assessment from Lammersville Unified. Lammersville Unified offered to provide reassessment in psychoeducation, but Parents declined. Parents later requested an independent examination in psychoeducation, and Lammersville Unified agreed. At this meeting, no reading goals were added to the October 20, 2021 IEP.

## THE SEPTEMBER 27, 2021 IEP MEETING

On September 27, 2021, the IEP team held a meeting to review the results of the independent psychoeducational examination. McCourtie, Wingo, Raza, Garcia, third grade teacher Jennifer Wichman, speech pathologist Deepa Nair, Parents, advocate Edwards, and Dr. Rubalcava attended the meeting.

Dr. Rubalcava held a doctorate in educational psychology and conducted an independent examination of Student. Dr. Rubalcava testified at the hearing. She reviewed Student's records and history, Lammersville Unified's academic and psychoeducational assessments of Student, and observed Student in her third-grade classroom. She interviewed Wichman and Cabri, Student's third and second-grade teachers, who reported that Student struggled with reading. Dr. Rubalcava also conducted tests of Student.

One of the tests administered by Dr. Rubalcava, but not by Raza, was the Feifer Assessment of Reading. This test measured reading ability and contained individual reading skills tests that were combined to form a Phonological Index, a Fluency Index, and a Comprehension Index. A Total Index was calculated by combining the subtests. Student's Total Index was a 73, which indicated that Student's reading and reading-related processes were in the low-range and that Student was functioning

better than only four percent of her peers in the same grade.  A score in that range indicated a reading weakness or disability consistent with dyslexia.

Based upon her assessment of Student, Dr. Rubalcava opined that Student had dyslexia and met the criteria of a specific learning disorder.  In Dr. Rubalcava's opinion, the dyslexia manifested in second grade when district psychologist Raza assessed Student.  Dr. Rubalcava did not dispute that Raza noted a severe discrepancy in the data on Student's reading comprehension and her academic abilities.  Dr. Rubalcava, however, opined that there was sufficient data and anecdotal evidence from Parents and the teachers that Student struggled with reading at the time and that Student could not process words correctly.  The overall weight of Lammersville Unified's psychoeducational, speech, and academic assessments showed a processing problem consistent with dyslexia.  Dr. Rubalcava concluded that Student did not have an attention deficit disorder and did not meet other health impairment eligibility criteria.

Dr. Rubalcava made several recommendations, including providing Student with a research-based reading intervention program administered four-to-five days per week for a minimum of 45 minutes per day.  Dr. Rubalcava listed the Wilson Reading System and Barton Reading system as two examples.  Both are Orton-Gillingham-based reading programs.  Dr. Rubalcava testified that these systems were examples, and other established Orton-Gillingham-based programs were available.  Dr. Rubalcava also recommended goals, services, and interventions that would aid Student.

The IEP team agreed with Dr. Rubalcava's assessment and changed Student's primary eligibility to specific learning disorder, with a secondary speech and language disability eligibility.  The team then discussed goals that had been prepared considering Dr. Rubalcava's findings and recommendations.  During this discussion, Garcia went over proposed goals to deal with reading fluency and comprehension.  Garcia explained that

Lammersville Unified used the SPIRE Reading Program, which was an Orton-Gillingham-based reading intervention.  Garcia testified that she had been thoroughly trained in implementing SPIRE and had used it with other students for three years.  Garcia suggested implementing the goal at Dr. Rubalcava's recommendation of 45 minutes per day, four days per week, and 60 minutes of weekly writing intervention. Garcia explained to the team how her intervention sessions with SPIRE would progress.

Advocate Edwards disagreed with the use of SPIRE.  Edwards insisted that Lammersville Unified use the Wilson Reading System instead.  Edwards claimed that SPIRE was not sufficiently comprehensive.  Edwards insisted that the team was not ready to discuss goals at this meeting because they had insufficient time to review them or the assessment.  The team tabled the discussion of the goals to the annual review.

## LAMMERSVILLE UNIFIED DENIED STUDENT A FAPE BY NOT PROVIDING READING GOALS IN THE OCTOBER 20, 2021 IEP

By October 2020, when the annual IEP meeting occurred, Parents and Cabri, agreed Student was now struggling with reading fluency and decoding.  Cabri told the team that Student was reading at a mid-Kindergarten level.  At this time, the IEP team decided to do an academic assessment and psychoeducational assessment to determine if Student suffered a specific learning disability.  Both assessments discussed above found significant variances in Student's reading ability.

In May of 2021, the IEP team met again to discuss Student's academic issues. Parents played a recording of Student reading a passage she had not read before.  The recording was played at the hearing.  Student struggled to read the short passage that Father selected from Student's schoolwork.  According to Father, Cabri indicated that this passage was above Student's reading level.  According to a non-district assessment

test given to Student, the team discussed that Student was reading at a first-grade level at the end of second grade. Student's current assessments measured Student's comprehension and fluency to be at a low first-grade level.

Independent assessor Dr. Rubalcava opined that dyslexia clearly manifested itself in the second grade. This opinion is consistent with the evidence in that Student's first and second-grade teachers both reported Student had significant reading struggles at the October 21, 2020 IEP meeting. The team suggested assessments to rule out a learning disorder. Both Garcia and Raza's assessments showed significant deficits in reading comprehension, fluency, and decoding. This data was reported at the December 9, 2020 IEP meeting and was consistent with the observations of Parents, Wichman, and Cabri. Although Raza thought that Student did fully meet the criteria for a specific learning disorder, the team had ample evidence to show Student was scoring in the low averages for reading comprehension and fluency and was struggling with reading by the beginning of the second grade.

While insufficient evidence existed to show that Student's reading difficulties manifested before the second-grade, once Lammersville Unified was on notice of those deficits, it had an obligation to act. While it correctly agreed to assess Student in psychoeducation and academics, Lammersville Unified failed to act on the anecdotal evidence and the data provided by those assessments when the IEP team reviewed them at the December 9, 2020 IEP team meeting. Regardless of Student's eligibility classification, Lammersville Unified was obligated to offer and provide Student with reading goals, services, and accommodations once sufficient data demonstrated that Student was struggling in reading and not progressing. This data existed when the two assessments were completed and reviewed at the IEP team meeting. As such, Student

proved by a preponderance of the evidence that Lammersville Unified's failure to offer Student reading goals as of December 9, 2020 was a denial of FAPE.

Because the evidence shows that Student's reading problems did not fully manifest until the second grade, Student did not prove by a preponderance of the evidence that Lammersville Unified should have been providing reading goals from January 14, 2020 to December 9, 2020.

## THE 2021-2022 IEP

### THE OCTOBER 20, 2021 IEP TEAM MEETING

The IEP team held Student's annual review on October 20, 2021. Present at the meeting were McCourtie, Raza, Garcia, Wichman, Parents, Nair and advocate Edwards.

The team reviewed Student's strengths and weaknesses and present performance levels. Student was an out-of-the-box thinker, friendly and polite. She also showed strengths in math, creativity, and perseverance. Parents expressed concerns that Student also needed some help in executive functioning. Wichman indicated that in math, Student had trouble with multi-step math problems and was weak in solving word problems. Often Student needed the teacher to read the word problem before she could solve it. Student was slow to complete writing tasks and required teacher support. However, Student's mental processes were appropriate and at grade level. Student was meeting her reading goal but still did not meet her articulation /r/ goal.

### PROPOSED 2021-2022 GOALS

The team proposed seven goals. The first was an academic goal in reading fluency. By October 20, 2022, when given a selected beginning of a third-grade passage, Student would read at an average fluency rate of 90 correct words per minute

with 95 percent accuracy across two consecutive trials, as measured by a standardized reading test. The goals provided two short-term objectives. The baseline was based upon Student reading 55 correct words per minute at the present level. Dr. Rubalcava testified that she believed this a measurable, appropriate goal. However, she opined that more "specificity" in the type of reading material would be helpful.

Goal number two was in reading and decoding. Student currently read words correctly with 68 percent accuracy. By October 2022, when presented with a fluency word list, Student would correctly decode words with an 80 percent accuracy on four-out-of-five trials as measured by mastery fluency reading tests. Two short-term objectives were provided. Dr. Rubalcava testified that she believed this to be a measurable, appropriate goal, but more "specificity" in the type of material would be helpful. She also felt the baseline was unclear.

The third goal was in academic writing. When Student was given a topic to write on, she wrote one long run-on sentence. By October 2022, following teacher-led prewriting activities, Student would independently compose a single paragraph including a topic sentence, three supporting sentences, and a concluding sentence, scoring on a teacher-developed rubric eight out of ten over three consecutive writing samples. There were two short-term objectives. Dr. Rubalcava testified that she believed this to be a measurable, appropriate goal, other than lacking specifics as to what type of activities the teacher would lead or the type of rubric used by the teacher.

The fourth goal was also a writing goal. Student currently did not use a writing checklist to edit or revise her writing. By October of 2022, Student would use a writing checklist and revise a writing assignment to improve capitalization, spacing between words, and use of punctuation, scoring a five on a six-point rubric in three of four trials.

The goal listed three short-term objectives. Again, Dr. Rubalcava felt the goal lacked specificity but testified that Goal number four was appropriate and measurable.

Goal number five was academic task initiation. Student currently independently initiated three-out-of-seven assignments in the classroom. She required adult prompting to initiate work. Once prompted, Student would stay on task for about seven minutes. By October of 2022, when presented with complex tasks or unsure of how to complete an assignment, Student would independently ask for assistance from an adult to initiate completion of the task without prompts. Student would maintain on-task behavior for at least 10 minutes across three consecutive observations as measured by observation collection data. The goal had two short-term objectives. Dr. Rubalcava testified that she felt the goal should be split into two because it was targeting two different behaviors. However, she otherwise believed the goal was appropriate and measurable.

The sixth goal was in math word problems. Student scored zero percent accuracy when presented with five third-grade, two-step mixed addition and subtraction word problems. By October 2022, when given 10 math word problems in a trial in addition and subtraction requiring two-step solutions, Student would determine how and when to break a problem into simpler parts with 80 percent accuracy in three consecutive trials as measured by Student work samples. This goal had two short-term objectives. Although Dr. Rubalcava did not make any recommendations in this area, she testified that the goal was appropriate and measurable.

The final goal was a continuation of Student's speech goal and articulation in the /r/ sounds. As of the 2021 IEP, Student was able to produce the vocalic-/r/ sounds with 18 percent accuracy with a moderate level of support and prompts. By October 2022, Student would produce the /r/ sounds in all word positions at the simple phrase-level

when given minimal prompts in four out of five trials with 80 percent accuracy as measured by the speech and language pathologist.

A second IEP team meeting was held on November 17, 2021 to go over the occupational therapy assessment and formulate the 2021-2022 IEP. During this meeting, Edwards maintained that the reading goals in fluency and decoding were not measurable or appropriate and that Parents did not agree with those goals. She claimed that the math goal was not measurable and not specific enough. Parents provided a two-page written exception to the IEP. Parents believed that the reading goals should be more specific, including what type of words and material would be used. Parents also disagreed with the writing goal (Goal number 3), indicating that the baseline was unclear and did not correlate to the actual goal. Finally, Parents objected to the fourth goal, contending it was vague, ambiguous, and not specific. Parents believed the goal to be inappropriate and unmeasurable. Parents did not object in writing to the speech, math, or task initiation goals.

Student did not prove by a preponderance of the evidence that the goals presented in the 2021-2022 IEP were inappropriate. Both advocate Edwards and Parents objected to many of the goals as inappropriate and unmeasurable. However, this was directly contradicted by Dr. Rubalcava, the independent assessor, who found all the goals measurable and appropriate. Dr. Rubalcava and Parents voiced the primary objection that the goals lacked specificity and did not call out specific words, rubrics, or trials in the goals. However, the IEP team did not need to draft IEP goals in a manner that the parents find optimal if the goals were objectively measurable. (*Bridges v. Spartanburg County School Dist. Two* (D.S.C. 2011, No. 7:10-cv-01873-JMC) 57 IDELR 128 [the use of percentages tied to the completion of discrete tasks was an appropriate way to measure student progress], citing *Virginia S. ex rel. Rachael M. v. Department of*

*Education, Hawaii, Civil No. 06-00128, 2007 WL 80814 (D.Hi. January 8, 2007).* The IEP must contain a description of how the child's progress toward meeting the annual goals will be measured and when periodic reports on the progress the child was making toward meeting the annual goals (such as using quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided. (20 U.S.C.A. § 1414(d)(1)(A)(iii).)

In a recent Ninth Circuit decision, *Crofts v. Issaquah Sch. Dist. No. 411*, 22 F.4th 1048, 1056–57 (9th Cir. 2022), the Court reiterated that a district was not required to use the methodology a parent preferred when providing special-education services for a child and that school districts were "entitled to deference in deciding what programming is appropriate as a matter of educational policy." Citing to *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 945 n.5 (9th Cir. 2010) and *Rowley*, 458 U.S. 176, 208, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Districts need not specify an instructional method unless that method was necessary to enable a student to receive a FAPE. (*Mercer Island*, *supra,* 592 F.3d at 952.) A district must merely provide an IEP "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1001; *Crofts* at 1056–57 (9th Cir. 2022)

Each of the seven goals proposed in the 2021-2022 IEP's met the legal standard by providing baselines, measurable, and short-term objectives. The goals in the October 20, 2021 IEP were appropriately designed to allow Student to progress. Lammersville Unified and Student each partially prevailed on Student's Issue 3.

STUDENT'S ISSUE 4: DID LAMMERSVILLE UNIFIED DENY STUDENT A FAPE DURING THE 2019-2020, 2020-2021, AND 2021-2022 SCHOOL YEARS, THROUGH JANUARY 14, 2022, BY FAILING TO PROVIDE PARENTS WITH A CLEAR WRITTEN OFFER OF FAPE, IN IEPS DATED NOVEMBER 6, 2019, OCTOBER 20, 2020, DECEMBER 9, 2020, AND OCTOBER 20, 2021?

Student claimed that the offers of FAPE in 2019-2020, 2020-2021, and 2021-2022 were not communicated to Parents. Lammersville Unified contended that the three FAPE offers were legally sufficient. Student did not prove that Lammersville Unified failed to make clear written offers in all three years.

The IDEA requires that an educational program be individually designed and reasonably calculated to provide meaningful educational benefit to a child with a disability. (*Gregory K. v. Longview School District* (9th Cir. 1987) 811 F.2d 1307, 1310 (*Gregory K.*).) The purpose of a written offer is to alert parents of the need to consider seriously whether a school district's proposed placement is appropriate under the IDEA. It helps parents determine whether to oppose or accept the placement with supplemental services. (*Union v. Smith* (9th Cir. 1994) 15 F.3d 1519, *cert. denied* (1994) 513 U.S. 965 (*Union*).) The IDEA explicitly requires written prior notice to parents when an educational agency proposes or refuses to initiate or change the educational placement of a child with a disability. (*Id.* at p. 1526; see also 20 U.S.C. § 1415(b)(1)(C).)

The requirement of a formal written offer creates a clear record that will eliminate troublesome factual disputes about what additional educational assistance the school district offered to supplement a placement. Failure to make a clear written offer of placement and services is a procedural violation of the IDEA. (*Union, supra.*, 15 F.3d at

p. 1527). See also title 20 U.S.C. § 1414(d)(1)(A)(i), 34 C.F.R. § 300.320(a), and Ed. Code § 56345, subdivision (a), *supra*.

As discussed above, an IEP meeting was held on November 6, 2019. Student was in first grade. The purpose of the meeting was to review Steneck's 2019 speech and language assessment. The team reviewed Student's speech assessment, created two speech goals, and provided speech services to Student. Parents agreed with the IEP and consented. The IEP contained the necessary information to inform Parents of the terms of the offer of services and supports and to allow Student to respond to the offer. (*Union, supra*, 15 F.3d at p. 1527.) The 2019-2020 IEP offer as written was legally compliant. (20 U.S.C. § 1414(d)(1)(A)(ii); 34 C.F.R. § 300.320(d)(2); Ed. Code, § 56345, subd. (h).) Lammersville Unified did not commit a procedural violation under the IDEA by failing to make a clear written offer, as contemplated by *Union*, *supra*, 15 F.3d at p. 1527.

An annual IEP meeting was held on October 21, 2020. The team proposed a continuation of goal number one in articulation for the /r/ words. No other goals were proposed. Speech services were continued. Student did not prove, by a preponderance of the evidence, that the 2020-2021 offer in the IEP was not clearly stated. Student again experienced reading deficits, and Parents raised continued concerns about Student's speech and academics. However, this is addressed in Issue 3 above and does not impact whether the offer that was made was sufficiently clear for Parents to understand. Lammersville Unified did not commit a procedural violation under the IDEA by failing to make a clear written offer on October 21, 2020, as contemplated by *Union*, *supra*, 15 F.3d at p. 1527.

The IEP team held Student's annual review on October 20, 2021, with a follow up meeting on November 17, 2021. Lammersville offered seven goals, speech services, and

intensive reading intervention as the independent psychological report recommended. Parents objected to the IEP, most of the goals, and the proposed services. Parents objected to the reading intervention Lammersville Unified was proposing to use. Parents' advocate argued on behalf of Student. When the IEP team concluded the meeting, Parents provided a two-page list of objections and exceptions. Parents testified that Edwards assisted them in composing the objections and exceptions. McCourtie followed up with Parents and Edwards by email to clarify any confusion or disagreement. Following that email exchange, Parents filed the instant due process hearing request.

There was simply no evidence that Parents or their advocate did not have a clear understanding of Lammersville Unified's offer in the 2021-2022 IEP. The IEP contained the necessary information to inform Parents of the terms of the offer of services and supports and allow Parents to respond to the offer. (*Union, supra*, 15 F.3d at p. 1527.) The 2021-2022 IEP offer as written was legally compliant. (20 U.S.C. § 1414(d)(1)(A)(ii); 34 C.F.R. § 300.320(d)(2); Ed. Code, § 56345, subd. (h).) Lammersville Unified did not commit a procedural violation under the IDEA by failing to make a clear written offer, as contemplated by *Union, supra*, 15 F.3d at p. 1527.

STUDENT'S ISSUE 5: DID LAMMERSVILLE UNIFIED DENY STUDENT A FAPE DURING THE 2019-2020, 2020-2021, AND 2021-2022 SCHOOL YEARS, THROUGH JANUARY 14, 2022, BY FAILING TO DELIVER AND IMPLEMENT SERVICES, AND SPECIFICALLY BY FAILING TO IMPLEMENT STUDENT'S NOVEMBER 6, 2019 IEP AS WRITTEN, BEGINNING IN MARCH 2020, DUE TO SCHOOL CLOSURES RELATED TO THE COVID-19 PANDEMIC, THE OCTOBER 20, 2020 IEP IN THE AREA OF SPEECH, AND OCTOBER 20, 2021 IEP IN ITS ENTIRETY?

## THE COVID-19 SHUTDOWN AND IMPLEMENTATION OF THE 2019 AND 2020 IEPS

Student contended that Lammersville Unified failed to implement Students 2019-2020 IEP during the Covid-19 pandemic. Student did not prove by a preponderance of the evidence that Lammersville Unified failed in its obligations.

This issue arose out of the universal 2020 COVID-19 pandemic, during which California's governor, consistent with the federal government and local governments, ordered a statewide shutdown of businesses and schools. The United States Department of Education initially issued guidance about the school shutdowns in March 2020. The Governor issued an executive order on March 22, 2020, granting local educational agencies the authority to close schools, accompanied by a directive to the California Department of Education, referred to as the CDE, to develop guidance that included "ensuring students with disabilities" received a FAPE consistent with their IEPs, and local educational agencies meeting other procedural requirements under the IDEA.

A local education agency that offers "distance learning" opportunities for its general education students has a concomitant duty to "make every effort to provide special education and related services to the child in accordance with the child's individualized education program." (*U.S. Dept. of Educ., Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak* (March 12, 2020) at p. 2.)  School districts must "ensure that students with disabilities also have equal access to the same opportunities [as general education students], including the provision of FAPE," and, "to the greatest extent possible, each student with a disability can be provided the special education and related services identified in the student's IEP developed under IDEA."  (*Ibid.)*

In subsequent guidance, the Office of Special Education and Rehabilitative Services, known as OSERS, recognized that educational institutions were "straining to address the challenges of this national emergency."  (OSERS, *Supplemental Fact Sheet Addressing the Risk of COVID-19 in Preschool, Elementary and Secondary Schools While Serving Children with Disabilities,* (March 21, 2020) at p. 1.)  OSERS assured school districts that "ensuring compliance with the IDEA should not prevent any school from offering educational programs through distance instruction." (*Ibid*.).  OSERS noted the provision of FAPE "might include, as appropriate, special education and related services provided through distance instruction provided virtually, online, or telephonically." (*Id*. at pp. 1-2.)  OSERS reiterated its March 12, 2020 guidance on compensatory education.  "Where, due to the global pandemic and resulting closures of schools, there has been an inevitable delay in providing services," IEP teams must make an individualized determination "whether and to what extent compensatory services may be needed when schools resume normal operations."  (*Id*. at p. 2.)

The CDE issued similar guidance on March 20, 2020, and April 9, 2020. (*Cal. Dept. of Educ., Special Education Guidance for COVID-19* (March 20, 2020); *Cal. Dept. of Educ., Special Education Guidance for COVID-19, COVID-19 School Closures and Services to Students with Disabilities* (April 9, 2020).). The CDE issued similar guidance on March 20, 2020, and April 9, 2020. (*Cal. Dept. of Educ., Special Education Guidance for COVID-19* (March 20, 2020); *Cal. Dept. of Educ., Special Education Guidance for COVID-19, COVID-19 School Closures and Services to Students with Disabilities* (April 9, 2020).). The CDE advised that if a local educational agency can continue providing special education and related services as outlined in the IEP or an agreed-upon amendment to the existing IEP, it should do so through a distance learning model. (*CDE Guidance* (March 20, 2020), *supra,* at Point 1.) The local educational agency could also consider alternative service delivery options such as in-home service delivery, meeting with individual students at school sites, or other appropriate locations to deliver services. The CDE also encouraged local educational agencies to work collaboratively with nonpublic schools and agencies to ensure continuity of services, including moving to virtual platforms for service delivery to the extent feasible and appropriate. (*Ibid.*)

When a local educational agency offers distance learning for instructional delivery instead of regular classroom instruction during a school site closure for students, it must also provide equitable access to those services for students with disabilities. A local educational agency must create access to the instruction, including "planning for appropriate modifications or accommodations based on the individualized needs of each student and the differences created by the change in modality such as a virtual classroom." (*CDE Guidance* (April 9, 2020), *supra*, at Point 2). Educational and support services should be commensurate with those identified in the IEP for each student to ensure educational benefit. (*Ibid.*)

Local educational agencies may consider the use of accessible distance technology, instructional phone calls, and other curriculum-based activities that have been "scaffolded" based on student needs.  (*CDE Guidance* (April 9, 2020), *supra*, at Point 2.)  The local educational agency could also consider alternative service delivery options such as in-home service delivery, meeting with individual students at school sites, or other appropriate locations to deliver services.  (*CDE Guidance* (March 20, 2020), *supra,* at Point 1.)

On April 27, 2020, the U.S. Secretary of Education announced through a Department of Education press release that the U.S. Department of Education was "not recommending Congress pass any additional waiver authority" concerning the FAPE and least restrictive environment requirements of the IDEA, noting again that "learning must continue for all students during the COVID-19 national emergency."  (*U.S. Dept. of Educ., Secretary DeVos Reiterates Learning Must Continue for All Students, Declines to Seek Congressional Waivers to FAPE, LRE Requirements of IDEA.*, April 27, 2020 Press Release).

In 2019-2020, Student was in first grade.  The shutdowns commenced in the middle of March 2020.  Mother testified that in the second grade, Student returned for four weeks in November 2020 for hybrid sessions, twice a week for half a day, until the school went back to distance learning in December of 2020.  Student was on a hybrid schedule in February 2021, then five days a week, for half a day in mid-April 2021, and back to full time in mid-May 2021.  Both Wichman and Cabri testified that distance learning likely delayed some of Student's reading and writing progression.

Other than this, Student presented little evidence which established the type of curriculum used during the pandemic, whether Student was or was not provided speech services, how Student's learning habits were affected by distance learning, or what

accommodations or interventions were made during the pandemic. There was no testimony from Parents that indicated any failures during distance learning. Cabri testified that when most of the virtual instruction occurred in second grade, Student made progress. She also opined that if Student had in-person teaching, Student would have progressed further.

On March 26, 2020, Lammersville Unified sent a letter to Parents, stating that Steneck would provide speech and language services for 15 minutes, once a week, in direct virtual, individual intervention. On August 17, 2020, Steneck sent a second letter which indicated that Student would receive 25 minutes, seven times a month of group intervention in speech through virtual teletherapy and consultation. Student did not present evidence establishing that Lammersville Unified failed to provide Student with her speech services virtually or in-person as required by the 2019 and 2020 IEPS. Also, Student continued to receive speech therapy up through the date of hearing, based upon the requirements of the 2020 IEP, which was the last consented to IEP. Student partially met one speech goal and was meeting the other. Student was progressing in speech and language.

As such, Student did not meet her burden of proof by a preponderance of the evidence that Lammersville Unified failed to deliver and implement services during the school closures in 2020 and 2021, and did not prove that the district failed to implement the speech services in the October 20, 2020 IEP.

## IMPLEMENTATION OF THE OCTOBER 20, 2021 IEP

Student asserted that Lammersville should have implemented the annual October 2021 IEP despite Parent's objections that the offer was not a FAPE. Lammersville Unified

concluded it did not have consent to implement the 2021-2022 IEP as written, and later filed its own due process complaint to defend the IEP FAPE offer.

At the October and November 2021 IEP meetings, Parents and their advocate articulated their opposition to the proposed goals and services. Following the meeting, Parents submitted a two-page written objection and exceptions to the IEP. As a result, representatives of Lammersville Unified reached out to Parents and their advocate for clarification as to whether the Parents wanted the district to implement the goals and services despite Parent's objections. Lammersville Unified contended that Parents and their advocate's instructions were ambiguous and unclear.

## IMPLEMENTATION OF GOALS

At the November 17, 2021 meeting, Lammersville Unified offered Student seven goals in speech, reading, writing, and math. Advocate Edwards objected to all the goals except for the articulation goal. Edwards objected to the remaining goals because they were not measurable, vague, and insufficiently specific. Edwards argued that there was a lack of consistency in implementing the goals or what services would be provided. Edwards also objected to the use of the Orton-Gillingham-based SPIRE program and insisted that Lammersville Unified use either the Wilson or Barton reading programs.

Parents stated that they "did not agree" with the reading fluency goal, reading decoding goal, writing goal, and writing and editing goal in the written two-page exceptions. Parents objected to the four goals as vague, ambiguous, not specific, not measurable, and not appropriate. Parents ended the two-page exceptions with the following statement:

I *do not agree with the IEP* as the District failed to develop an individual offer and the cookie cutter plan was based on administrative convenience...*I agree to the*

*implementation of special education supports and related services.* I *do not agree the 10/20/21 IEP and the subsequent November 17, 2021, Amendment in their entirety* as neither are calculated to enable [Student] to make progress...and I maintain the IEP does not provide [Student] a FAPE. (Emphasis added)

## IMPLEMENTATION OF SERVICES

The October 20, 2021 IEP offered Student special education and related services, includeding 360 minutes a month of speech services, three times weekly in a group session. The IEP team also offered specialized academic instruction following the recommendation of Dr. Rubalcava. Student would be provided 345 minutes per week, consisting of five 45-minute sessions per week, with an explicit multi-structured sensory reading program, along with 60 minutes a week of group writing intervention and 60 minutes a week of group math intervention. Student would also be provided 240 minutes per week, four times in 45-minute sessions group reading intervention, and 60 minutes per week writing intervention.

At the meetings in October and November 2021, Lammersville Unified's representatives advised Parents they would use the SPIRE reading program. SPIRE is an intensive multi-sensory reading intervention for non-readers and struggling readers. It is a research-proven reading intervention for low-performing students that uses a dynamic 10-step lesson plan. The plan is teacher-led, and explicit. It uses auditory, visual, and kinesthetic activities to keep students actively engaged. The program focuses on phonological awareness, phonics, spelling, fluency, comprehension, vocabulary, and writing. Sheila Clark-Edmands, an Orton-Gillingham Fellow, developed the SPIRE program. The SPIRE program has been used by many different school districts and has been researched and approved by educators.

Dr. Saylor's duties as Special Education Director included locating and purchasing a sound Orton-Gillingham-based reading intervention system for Lammersville Unified's use. Dr. Saylor reviewed many of the programs and concluded that the SPIRE was the correct fit for the Lammersville Unified's needs. Garcia was trained in the SPIRE program and implemented it for the prior three years. At the September 27, 2021 IEP meeting to discuss Dr. Rubalcava's report, Garcia explained that she would use exercises that required Student to compose a paragraph, including a topic sentence, three supporting sentences, and a concluding sentence. She would use checklists and rubrics to measure the implementation of the services and goals. Garcia would go over phonics, letters, and sounds with Student and would tailor the SPIRE lessons to the Student's weaknesses.

At September 27, 2021 meeting, advocate Edwards objected to the use of SPIRE because it "was not comprehensive enough." She subsequently raised these objections at the October and November 2021 IEP meetings. Advocate Edwards insisted that Lammersville Unified hire a Wilson Reading Program therapist to provide services to Student. There was no evidence that Edwards had any training or experience in education, psychology, or reading interventions beyond her personal experience as a parent of a child with disabilities and her involvement in a volunteer dyslexia foundation. However, Edwards opined at hearing that the Wilson Program was a better fit. She acknowledged she knew little about SPIRE, had limited experience with the program, and had never attended a SPIRE training. Edwards's testimony on this issue was not credible.

In the two-page written exceptions, Parents also objected to the use of SPIRE. Parents objected that 45 minutes sessions versus 60-minute sessions were not enough. Parents argued that Dr. Rubalcava recommended the Wilson or Barton programs and

that SPIRE was a supplemental curriculum only.  Parents ended the exceptions with the statement: "I do not agree with the implementation of S.P.I.R.E."

Although Edwards and Parents raised objections that SPIRE was research-based, not "evidence-based," in her independent report, Dr. Rubalcava recommended that Student be provided with "a *research based reading intervention program* that is administered four-to-five days per week for a minimum of 45 minutes per day" (Emphasis added).  She also stated that two examples of such a program are the Wilson Reading program and the Barton Reading program.  Dr. Rubalcava did not recommend using either program in her report.  At the hearing, Dr. Rubalcava testified that she was unfamiliar with SPIRE and had no opinions about its efficacy.  She agreed that Wilson and Barton are not the only Orton-Gillingham-based programs.  She mentioned them because those were the two programs she was familiar with.

Parents testified that they did not think the SPIRE program would allow Student to progress fast enough.  Father testified that he investigated SPIRE and believed it was more research-based and not going to be helpful for Student.  Mother believed that based on her history of dyslexia, SPIRE would not be comprehensive enough to help Student in the right amount of time.  While Parents concerns were sincere and credible, they did not have sufficient training or experience to establish that the SPIRE program was insufficient.

Parents also objected to the district's refusal to provide Student with an extended school year.  Parents contended that the district predetermined this.

## DISTRICT'S REQUEST FOR CLARIFICATION AND PRIOR WRITTEN NOTICE

On December 6, 2021, McCourtie emailed Mother and requested clarification on Parents' exceptions and instructions. McCourtie observed that while Parents agreed with eligibility and implementation of specialized academic services and speech therapy services, they also listed goals and services they did not agree to and did not clarify if they agreed to the goals that were not explicitly objected to. She also pointed out that Parents and their advocate had specifically objected to implementing the SPIRE program, which was the service the district intended to use.

Advocate Edwards responded to McCourtie's email. She cut and pasted the final section of Parent's written exception quoted above and highlighted the portion that stated, "I agree to the implementation of special education supports and related services." Edwards stated that she "hoped" this helped. McCourtie responded that the paragraph, in and of itself, was vague and ambiguous. While, on the one hand, Parents unequivocally disagreed with the type of services and some goals, Parents then stated that they wanted the services implemented. Lammersville Unified was uncertain which goals and services were to be implemented. McCourtie suggested it would be more precise for Lammersville Unified if Parents listed the specific goals and services they did not want to be implemented and which services they did want to be implemented. Edwards responded that she believed the paragraph in question was "clear."

On December 10, 2021, Dr. Saylor sent a Prior Written Notice in response to Parent's exceptions. Dr. Saylor outlined the inconsistencies in Parent's exceptions to the IEP, noting that Parents specifically objected to the implementation of the SPIRE program and objected to specific goals. McCourtie had reached out to Parents and Edwards for clarification, but the response did not clarify what services and goals

Parents agreed could be implemented. Dr. Saylor concluded that because of the ambiguity and breadth of the exceptions, Lammersville Unified did not believe that any aspect of the IEP could be legally implemented. He stated that where a parent's partial consent affects the ability of the district to provide a FAPE, it is obligated to seek an order to allow it to implement the IEP. Dr. Saylor requested that Parents provide full consent to the IEP, reserving any objections to the adequacy of the FAPE offer. Neither Parents nor Edwards responded.

Student did not prove by a preponderance of the evidence that Lammersville Unified failed to properly implement the goals and services in the October 21, 2021 IEP. The testimony, the written IEPs, the transcripts of the IEP meetings, the emails, letters, and written documents establish that Parents and Edwards were sending ambiguous and vague instructions to district personnel. For example, in the same paragraph Parents unequivocally objected to the implementation of SPIRE and services, they followed up with a sentence indicating that they wanted services and goals implemented. Mother's testimony demonstrated her own confusion about what the Parents were seeking. Following questioning by both district's counsel and the ALJ, Mother articulated that she wanted Lammersville Unified to implement the specialized academic services outlined in the October 20, 2021 IEP but did not want SPIRE to be the multi-sensory program used.

Concerning the goals in the October 20, 2021 IEP, Parents specifically objected to specific goals but then requested those goals be implemented later in the document. When McCourtie sought clarification and guidance from Parents and specifically requested that Parents identify which goals and services they did not want to be implemented, Edwards responded by cutting and pasting a portion of the exceptions

with the declarative statement that it was "clear." Parents never responded directly to McCourtie.

When Dr. Saylor sent his December 10, 2021 Prior Written Notice, he also asked that Parents consent to the IEP, reserving any objections they may have as to the offer being a FAPE. Parents did not respond but instead filed the due process complaint. Lammersville Unified could not implement the IEP because Parents never unambiguously stated what goals and services could be implemented

Lammersville Unified delivered and implemented services during the school closures in 2020 and 2021. Lammersville Unified reasonably complied with Federal and State laws by not implementing the October 2021 IEP's goals and services over Parent's objections. Lammersville Unified prevailed on Student's Issue 5.

STUDENT'S ISSUE 6: DID LAMMERSVILLE UNIFIED DENY STUDENT A FAPE DURING THE 2019-2020, 2020-2021, AND 2021-2022 SCHOOL YEARS, THROUGH JANUARY 14, 2022, AND SPECIFICALLY, AT IEP TEAM MEETINGS DATED NOVEMBER 19, 2019, OCTOBER 20, 2020, DECEMBER 9, 2020, MAY 11, 2021, SEPTEMBER 8, 2021, AND OCTOBER 20, 2021, WHEN IT PREDETERMINED STUDENT'S SPECIAL EDUCATION ELIGIBILITY, SUPPORTS, RELATED SERVICES, AND PLACEMENT?

Student contended that Lammersville Unified predetermined Student's special education eligibility, supports, services and placement at the IEP meetings listed above. Lammersville Unified stated it did not predetermine Student's IEP's and that Parents meaningfully and fully participated in the IEP team meetings. Student did not meet her burden of proof on this issue.

Denying parental access to the IEP process is a serious procedural violation of the IDEA. *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 882 n. 1 (9th Cir.2001); *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1132 (9th Cir. 2003). Among the most important procedural safeguards are those that protect the parents' right to be involved in the development of their child's educational plan. Parents not only represent the best interests of their child in the IEP development process, they also provide information about the child critical to developing a comprehensive IEP and which only they are in a position to know. (*Amanda J.,* at 882). See also *Shapiro v. Paradise Valley Unified Sch. Dist.*, 317 F.3d 1072, 1077–78 (9th Cir.2003) ("It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process ... as it did upon the measurement of the resulting IEP against a substantive standard." (quoting *Rowley*, 458 U.S. at 176, 102 S.Ct. 3034)).

A school district violates IDEA procedures if it independently develops an IEP, without meaningful parental participation and then simply presents the IEP to the parent for ratification (*Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, at 1131 (9th Cir. 2003)). A school district may not enter an IEP meeting with a "take it or leave it" position, and if it does so, then even the parents' decision not to cooperate thereafter may not excuse the district's error. *(Id.)*.

Predetermination is a procedural violation of the IDEA that occurs in connection with an IEP team meeting when a district has decided on its offer prior to the meeting, such as when it presents one placement option at the meeting and is unwilling to consider other alternatives. (*H.B. v. Las Virgenes,* 239 Fed.Appx. 342, 344 345.) Predetermination causes a deprivation of educational benefits where, absent

the predetermination, there is a strong likelihood that alternative educational possibilities for the student would have been better considered.  (*M.S. v. Los Angeles Unified School Dist.* (C.D. Cal. September 12, 2016, Case No. 2:15-cv-05819-CAS-MRW) 2016 WL 4925910 at p.12. (citing *Doug C., supra*, 720 F.3d 1038, 1047).)  District team members may form opinions prior to IEP meetings.  However, if the district goes beyond forming opinions and becomes "impermissibly and deeply wedded to a single course of action," this amounts to predetermination.  (*P.C. v. Milford Exempted Village Schools* (S.D. Ohio, Jan. 17, 2013, No. 1:11- CV-398) 2013 WL 209478, p.7.)

School staff is permitted to meet in advance of an IEP team meeting to form opinions, compile reports, discuss a child's special education, and otherwise engage in preparatory activities to develop a proposal or response to a parent proposal that will be discussed at a later IEP team meeting.  (See, 34 C.F.R. §§ 300.501(b)(1) and (b)(3); *N.L. v Knox County Schools, supra,* 315 F.3d 688, 694, n. 3, in which the court stated: "Indeed, without some organization and evaluation [by school staff] prior to the IEP Team meeting, it is unclear how an IEP Team could make reasonable and informed decisions.")

In this case, Student did not present evidence that Student objected to placement, or that Lammersville Unified predetermined the placement of Student. Regarding participation in discussing Students goals and services, Parents were present at each of the meetings held on November 19, 2019, October 20, 2020, December 9, 2020, May 11, 2021, September 8, 2021, and October 20, 2021.  The meetings' notes and the testimony of meeting attendees established that Parents fully participated in the 2019 and 2020 IEP team meetings.  Additionally, Parents were asked if they received the procedural guidelines and if they had any questions regarding those guidelines.

At the first IEP meeting in November of 2019, Parents fully participated, and the IEP team meaningfully discussed the issues of concern following the speech assessment. Parents agreed to the services provided and did not object.

After Parents raised concerns regarding Student's academics and readings at the October 20, 2020 meeting, the IEP team agreed to undertake additional assessments to determine if Student had a learning disability. At the December 9, 2020 meeting discussing the academic and psychoeducation assessments, Parents again expressed concerns about Student's possible dyslexia and academic issues. These concerns were discussed, and the team agreed to revisit Student's reading issues in Spring 2021.

The team held an IEP meeting on May 11, 2021, and Parents attended with their advocate Edwards. Parents and their advocate were involved in the discussions. Lammersville Unified team members offered to provide Student with additional assessments in assistive technology and speech and language. They also offered to do further psychoeducational testing. Parents declined the latter and requested an independent examination. Lammersville Unified agreed. When Parents requested that a written exception be added to the October 20, 2020 IEP in May 2022, to which Parents consented, Lammersville Unified complied.

Parents and Edwards attended the October 21 and November 17, 2021 IEP meetings. The meetings were audio recorded. The notes and transcripts of that meeting show a vast amount of participation by both the advocate and Parents. Following the two meetings, Parents submitted a written two-page exception notice. The only issue of "predetermination" raised in the written exception was that Lammersville Unified had decided that Student was not eligible for an extended year school program. However, there was little evidence that the district had pre-decided this issue with no input from Parent. Instead, both the IEP team and Dr. Saylor

communicated to Parent that the denial was due to a lack of data, and they would revisit the issue once they had more data to analyze.

Finally, regarding the specific goals and services, the evidence established that Parents and Edwards extensively participated in the discussion of goals and services, and that McCourtie and Garcia later modified some of the goals and services in line with Parents' requests. Parents and Edwards objected to Lammersville Unified's use of the SPIRE reading program and instead requested that Lammersville Unified use alternative Orton-Gillingham programs. Student argued that Lammersville Unified offered SPIRE as a "take it or leave it" option and was not open to modifications in services or providers. As discussed above, while Parents and Edwards were adamant that SPIRE was not comprehensive enough, Student presented absolutely no evidence, including expert witness testimony, that established Wilson or Barton would be better programs for Student. The only expert who testified was Dr. Rubalcava. She testified she had no knowledge of SPIRE and mentioned the Wilson and Barton programs as examples she was familiar with. Lammersville Unified educators were entitled to deference in deciding what programming is appropriate as a matter of educational policy. (*Crofts*, *supra*, at 1056-7.) Lammersville Unified did not predetermine Student's needed services.

Student did not meet her burden of proof that Lammersville Unified predetermined any of the goals, services, or placement options offered in the 2019, 2020, and 2021 IEPs. Lammersville Unified prevailed on Student's Issue 6.

STUDENT'S ISSUE 7: DID LAMMERSVILLE UNIFIED DENY STUDENT A FAPE DURING THE 2019-2020, 2020-2021, AND 2021-2022 SCHOOL YEARS, THROUGH JANUARY 14, 2022, AND SPECIFICALLY, AT IEP TEAM MEETINGS DATED NOVEMBER 19, 2019, OCTOBER 20, 2020, DECEMBER 9, 2020, MAY 11, 2021, SEPTEMBER 8, 2021, AND OCTOBER 20, 2021, BY FAILING TO MAKE AN OFFER OF SUPPORTS, SERVICES, INSTRUCTION, AND PLACEMENT TO ENABLE STUDENT TO MAKE PROGRESS IN LIGHT OF STUDENT'S CIRCUMSTANCES?

## PLACEMENT

Student presented no evidence that Student objected to a placement offer in the 2019, 2020 or the 2021 IEP's. Parents were satisfied with Student's placement at Bethany Elementary in general education with supports and services. Parents never requested placement at an alternative school or in a different type of classroom.

## ACCOMMODATIONS AND SERVICES

Related services may be provided to individuals or small groups in a specialized area of educational need and throughout the full continuum of educational settings. (Cal. Code Regs., tit. 5, § 3051, sub. (a)(1).) Related services, when needed, are determined by the IEP team. (Cal. Code Regs., tit. 5, § 3051, subd. (a)(2).). Here, Student proved by a preponderance of the evidence that Lammersville Unified failed to offer Student a FAPE in the area of reading services from December 9, 2020, to November 17, 2021. Lammersville Unified otherwise provided Student an offer of FAPE in all other periods.

## SPEECH SERVICES

At the IEP team meeting held on November 6, 2019, Gregorich indicated that Student was struggling with language and confidence. Student was able to recall receptive language and was verbal and expressive. The IEP team agreed that Student qualified for special education services under speech and language impairment in the areas of articulation. Lammersville Unified offered Student speech services twice weekly to address articulation errors provided outside of the classroom. Parents consented to these services. Student presented no evidence that the speech services were inadequate nor inappropriate.

In October of 2020, Student was reading at the middle first-grade level and had mastered short vowel sounds. She received test assistance with an aide or teacher reading questions on an as-needed basis. Student was making good progress on her speech goals. She continued to need prompting to keep her tongue back when produce /r/ sounds, and to remain focused and on task.

Student had not met her first goal of speech intelligibility. Student met her second goal of /s/ and /s/ blends. The team proposed a continuation of goal number one, in articulation for the /r/ words, and continuation of speech services. Parents agreed with the IEP at the time, although they later requested that Lammersville Unified include a two-page document noting exceptions in May of 2021.

At the October 2021 and November 2021 meetings, Lammersville Unified offered continued speech services at 360 minutes per month. Student also had a speech goal in articulation. No objections were raised to the specific goal or the number of services provided in speech. McCourtie testified that based upon her September 2021

assessment of Student, Student was progressing in areas of speech but still needed services to refine her articulation.

Student did not prove by a preponderance of evidence that Lammersville Unified failed to provide an offer of sufficient services and accommodations in speech and language.

## READING SERVICES

Lammersville Unified denied Student a FAPE by failing to offer reading services, accommodations, and interventions in the October 20, 2020 annual IEP.  Lammersville Unified met its obligations in this area for the November 19, 2019 and October 20, 2021 IEPs.

As discussed in detail in Issue 3, by the October 21, 2020 IEP meeting, Parents and Cabri agreed Student was struggling with reading fluency and decoding.  Cabri told the team that Student was reading at a mid-Kindergarten level at the commencement of the second grade.  On December 8, 2020, both assessors found significant variances in Student's reading ability.

In May of 2021, the IEP team met again to discuss Student's academic issues. Parents played a recording of Student reading a passage and Student struggled to read the short passage. Parents requested and received permission to have an independent educational examination conducted by Dr. Rubalcava in psychoeducation.  The September 2021 independent psychoeducational evaluation found that Student suffered from dyslexia and recommended that Student be eligible for services under a specific learning disability.  At the following IEP team meetings, the IEP team agreed to change Student's eligibility to specific learning disability.  As outlined in Issue 3,

Lammersville Unified was required to provide Student goals, accommodations, and services as part of the October 20, 2021 IEP.

Because the evidence shows that Student's reading problems did not fully manifest until the second grade, Student did not prove by a preponderance of the evidence that Lammersville Unified should have been providing reading interventions from January 14, 2020 to December 9, 2020. As discussed in detail above and in the analysis of Lammersville Unified's issue below, the IEP team proposed several goals in the areas of reading and writing and additional interventional services for the 2021-2022 years. Lammersville Unified's offer of reading services and interventions in the October 20, 2021 IEP was a FAPE.

EXTENDED SCHOOL YEAR

As mentioned above, Student objected that Lammersville Unified failed to provide extended school year offers in 2020 and 2021. Student did not present any evidence of regression and recoupment issues to contradict Lammersville Unified's position that Student did not require extended school year services. Student did not meet her burden of proof that Lammersville Unified denied Student a FAPE because it did not offer extended school.

Student demonstrated that Lammersville Unified denied Student a FAPE by failing to offer reading services from December 9, 2020 through November 17, 2021. Student partially prevailed on Student's Issue 7. Otherwise, all other offers made by Lammersville Unified offered Student a FAPE.

# LAMMERSVILLE UNIFIED'S ISSUE 1: DID LAMMERSVILLE UNIFIED'S OCTOBER 20, 2021 IEP OFFER STUDENT A FAPE IN THE LEAST RESTRICTIVE ENVIRONMENT?

The legal analysis of a school district's compliance with the IDEA consists of two parts. First, the ALJ must determine whether the district has complied with the procedures outlined in the IDEA. (*Rowley*, supra, 458 U.S. at pp. 206-207.) Second, the ALJ must decide whether the IEP developed through those procedures was designed to meet the child's unique needs and reasonably calculated to enable the child to receive educational benefit. (*Ibid.*)

## PROCEDURAL REQUIREMENTS

Lammersville Unified held two meetings in September 2021 to review the speech and language assessment, the assistive technology assessment, and Dr. Rubalcava's independent assessment. Lammersville Unified then convened the annual IEP team meeting on October 20, 2021, which the IEP team concluded at a subsequent November 17, 2021 meeting.

Parents were provided all assessment reports before each meeting. The IEP team considered the results of these recent evaluations of Student's academic and functional needs in developing Student's annual IEP at the October and November 2021 IEP team meetings. Student did not present any evidence that Parents were not provided any of the procedural safeguards prior to the October and November 2021 IEP meetings or that Parents did not receive proper notice as required by law.

All required people attended the meetings to formulate the annual October 2021 IEP. Parents and their advocate, the third-grade general education

teacher, representatives of Lammersville Unified who were qualified to provide or supervise specially designed instruction to meet the unique needs of children with disabilities, as well as Raza, Garcia, McCourtie, and Nair.

At the October 20, 2021 IEP meeting the IEP team considered Student's communication and reading challenges, occupational therapy challenges, behavioral needs, strengths, and progress. Parents and their advocate provided ample feedback and clearly communicated their objections to goals and services proposed. The IEP team agreed to reconvene the meeting in November 2021 to allow both sides to review proposed goals and the assessment reports.

On November 17, 2021, the IEP team met and completed the review of the remaining reports and goals. By the close of the meeting, Lammersville Unified's team members presented an IEP offer and went over the proposed goals one-by-one. Lammersville Unified then provided Parents time to consider the final FAPE offer. Parents presented Lammersville Unified with a two-page document with exceptions to the IEP. Lammersville Unified considered those objections and asked for more clarification. The advocate Edwards declined to provide further clarification. On December 10, 2021, Dr. Dr. Saylor sent a Prior Written Notice to Parents stating that Lammersville Unified would not implement the IEP over Student and Parents' objections and would seek a ruling from OAH.

As discussed in detail above, Lammersville Unified proposed seven new goals for 2021-2022. Those goals were measurable and appropriate. Lammersville Unified was not legally required to draft IEP goals in a manner that Parent found optimal. The goals were sufficiently clear and unambiguous for the staff and providers to measure. All seven proposed goals were based upon Student's present levels of academic achievement and functional performance. The IEP included appropriate objective

criteria evaluation procedures and schedules for determining whether the annual goals were being achieved and stated how Student's progress toward the goals would be measured. Student had a reasonable chance of attaining each goal within a year.

Lammersville Unified met the procedural requirements of 34 Code of Federal Regulations section 300.501(b) & (c) and Education Code, sections 56304, 56341.

## SUBSTANTIVE REQUIREMENTS

In line with all the assessments, Lammersville Unified also offered appropriate support services to Student. The IEP team reviewed Student's services during the October and November 2021 meetings. Lammersville Unified offered:

- Specialized Academic Instruction for 345 minutes per week in an explicit, structured multi-sensory reading program, as well as 60 minutes of writing and math intervention per week in a group setting;
- Individual speech and language services for 360 minutes per month; and,
- Reading intervention for 240 minutes per week.

The primary objections raised by Parents were the use of the SPIRE program and that Student should have five sessions of 60 minutes rather than 45 minutes. The IEP team, however, chose services and sessions consistent with the recommendations of independent assessor Dr. Rubalcava. Likewise, Student produced no evidence that the use of the SPIRE program by Lammersville Unified was inappropriate or inferior to other Orton-Gillingham programs. The SPIRE reading program was a nationally accepted Orton-Gillingham reading program that had been used by numerous districts and had achieved success with Students who suffered low range reading deficits, including dyslexia.

The evidence established this level of support was sufficient to enable Student to make appropriate progress considering Student's circumstances. The October 20, 2021, annual IEP presented a coherent, formal, written offer specifying the placement and the additional assistance to supplement the placement, consistent with the requirements of 20 U.S.C. Sec. 1415(b)(1)(C). The placement and services Lammersville Unified offered Student in the October 20, 2021 IEP constituted a FAPE in the least restrictive environment.

## CONCLUSIONS AND PREVAILING PARTY

As required by California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided.

Student's Issue 1: Lammersville Unified did not deny Student a FAPE during the 2021-2022 school year, through January 14, 2022, by failing to provide Student's educational records to Parents and Student's attorney within statutory timelines. Lammersville Unified prevailed on Student's Issue 1.

Student's Issue 2: Lammersville Unified did not deny Student a FAPE during the 2018-2019, 2019-2020, 2020-2021, and 2021-2022 school years, through January 14, 2022, by failing to adhere to child find obligations, failing to timely and appropriate assess Student in all areas of suspected disability, failing to conduct a health assessment, failing to conduct an assistive technology assessment, and conduct any appropriate evaluation. Lammersville Unified prevailed on Student's Issue 2.

Student's Issue 3: Lammersville Unified did not deny Student a FAPE during the 2019-2020 and 2021-2022 school years, through January 14, 2022, by failing to offer

Student appropriate and measurable annual goals in the areas of reading, spelling, writing, math, and speech.

Lammersville Unified denied Student a FAPE by failing to offer appropriate and measurable annual goals in the area of reading comprehension in the October 21, 2020 IEP. Lammersville Unified and Student partially prevailed on Student's Issue 3.

Student's Issue 4: Lammersville Unified did not deny Student a FAPE during the 2019-2020, 2020-2021, and 2021-2022 school years, through January 14, 2022, by failing to provide Parents with a clear written offer of FAPE, in IEPs dated November 6, 2019, October 20, 2020, December 9, 2020, and October 20, 2021. Lammersville Unified prevailed on Student's Issue 4.

Student's Issue 5: Lammersville Unified did not deny Student a FAPE during the 2019-2020, 2020-2021, and 2021-2022 school years, through January 14, 2022, by failing to deliver and implement services, and specifically by failing to implement Student's November 6, 2019 IEP as written, beginning in March 2020, due to school closures related to the COVID-19 pandemic, October 20, 2020 IEP in the area of speech, and October 2021 IEP in its entirety. Lammersville Unified prevailed on Student's Issue 5.

Student's Issue 6: Lammerville Unified did not deny Student a FAPE during the 2019-2020, 2020-2021, and 2021-2022 school years, through January 14, 2022, and specifically, at IEP team meetings dated November 19, 2019, October 20, 2020, December 9, 2020, May 11, 2021, September 8, 2021, and October 20, 2021, by predetermining Student's special education eligibility, supports, related services, and placement. Lammersville Unified prevailed on Student's Issue 6.

Student's Issue 7: Lammersville Unified did not deny Student a FAPE during the 2019-2020, 2020-2021, and 2021-2022 school years, through January 14, 2022, and

specifically, at IEP team meetings dated November 19, 2019, October 20, 2020, December 9, 2020, May 11, 2021, September 8, 2021, and October 20, 2021, by failing to make an offer of supports, services, instruction, and placement to enable Student to make progress in light of Student's circumstances in the areas of speech and language, placement, and extended school year services. Lammersville did not deny Student a FAPE by failing to make an offer of supports, services, instruction, and placement to enable Student to make progress in reading, writing and fluency for the 2021-2022 school year.

Lammersville Unified denied Student a FAPE from December 9, 2020 through November 17, 2021, by failing to offer Student sufficient and appropriate supports, services and instruction in the area of reading comprehension, reading fluency and decoding, and writing. Lammersville Unified and Student partially prevailed on Student's Issue 7.

Lammersville Unified's Issue 1: Lammersville Unified's October 20, 2021 IEP offered Student a FAPE in the least restrictive environment. Lammersville Unified prevailed on Lammersville Unified's Issue 1.

REMEDIES

## STUDENT'S REMEDIES

Student partially prevailed on Issues 3 and 7. Student is entitled to a remedy for the denial of a FAPE.

ALJ's have broad latitude to fashion appropriate equitable remedies for FAPE denials. (*School Comm. of Burlington v. Department of Educ.* (1985) 471 U.S. 359, 370 [105 S.Ct. 1996, 85 L.Ed.2d 385] (*Burlington*); *Parent of Student W. v. Puyallup Sch. Dist., No. 3* (9th Cir. 1994) 31 F.3d 1489, 1496 (*Puyallup*).) In remedying a FAPE denial, the student is entitled to relief that is "appropriate" in light of the purposes of the IDEA. (20 U.S.C. § 1415(i)(2)(C)(iii); 34 C.F.R. § 300.516(c)(3)(2006).) Appropriate relief means "relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." (*Puyallup, supra,* 31 F.3d. at p. 1497.)

Compensatory education is an equitable remedy that depends upon a fact-specific and individualized assessment of a student's current needs. (*Puyallup, supra,* 31 F.3d at p. 1496; *Reid v. District of Columbia* (D.C.Cir. 2005) 401 F.3d 516, 524 (*Reid*).) The award must be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place" (*Reid, supra,* 401 F.3d at p. 524; *R.P. ex rel. C.P. v. Prescott Unified Sch. Dist.,* 631 F.3d 1117, 1125 (9th Cir. 2011).). However, hour-for-hour relief for a denial of FAPE is not required by law. (*Puyallup, supra,* 31 F.3d at p. 1497.) "[E]quitable considerations are relevant in fashioning relief." (*Burlington, supra,* 471 U.S. at p. 374.)

The ALJ relied on the school calendars for the 2020-2021 and 2021-2022 regular school years to calculate remedies. From December 9, 2020, the date of the IEP meeting

discussing the academic and psychoeducational assessments, to November 17, 2021, the final meeting for the 2021-2022 IEP, approximately 34 school weeks, elapsed. Lammersville Unified should have provided specialized instruction to Student using an Orton-Gillingham-based reading intervention program during this time. Dr. Rubalcava recommended four or five sessions of 45 minutes per week in an Orton-Gillingham-based program. Student's proposed 2021-2022 IEP provided Student would receive specialized academic instruction per week at five 45-minute sessions in the SPIRE program. That totals 225 minutes, or three hours and 45 minutes per week.

The only evidence of the cost of compensatory education offered by the Student was the tuition at the Slingerland program at the Livermore Valley Academy. Ferishta Kulaly testified that one year's tuition for 2022-2023 would cost $19,900 and that Student would require a one-on-one aide to get up to speed. That would cost an additional $3,500. However, the parties stipulated that Livermore was not a California Department of Education certified learning institution, and there was no evidence of a breakdown of costs per hour for Slingerland. Mother testified that she had paid a teacher from Livermore trained in an Orton-Gillingham program $50 per hour to tutor students. This totaled $1,800 for the time in question.

Student is entitled to 7,650 minutes, or 127.5 hours of academic instruction in an Orton-Gillingham-based reading program. Lammersville Unified shall provide Parents with a choice of three non-public agencies that provide Orton-Gillingham instruction and shall fund the reading program for Student from a contracted certified nonpublic agency, up to a total of 7,650 minutes, or 127.5 hours of instruction.

Lammersville will also reimburse Parents for the services of the Orton-Gillingham tutor until November 17, 2021, which totals $1,800.

Compensatory services shall be available to Student until June 30, 2024 and shall not exceed 127.5 hours.

## DISTRICT'S REMEDIES

Lammersville Unified prevailed on its one issue. Lammersville Unified may implement the October 20, 2021 IEP without parental consent if Student seeks special education services.

## ORDER

1. Lammersville Unified shall provide Parents with a choice of three non-public agencies that provide Orton-Gillingham instruction and shall fund the reading program for Student from a contracted certified nonpublic agency, up to 7,650 minutes, or 127.5 hours of instruction.

2. These services shall be available to Student until June 30, 2024.

3. Lammersville Unified shall reimburse Parent $1,800 for Orton-Gillingham tutoring services incurred until November 17, 2021.

4. Lammersville Unified may implement the October 20, 2021 IEP without Parents' consent if Student continues to receive special education services from the district.

5. A written agreement between the parties may alter the terms of this Order. An IEP can constitute such an agreement.

6. Student's other requests for relief are denied.

## RIGHT TO APPEAL THIS DECISION

This is a final administrative decision, and all parties are bound by it.  Pursuant to Education Code section 56505, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within 90 days of receipt.


Brian H. Krikorian

Administrative Law Judge

Office of Administrative Hearings